[Crim. No. 44. Fourth Appellate District.—May 19, 1931.]

THE PEOPLE, Respondent, v. RAMON BONILLA, Appellant.

H. Wenzlaff and Stephen Bedford for Appellant.

U. S. Webb, Attorney-General, and John L. Flynn, Deputy Attorney-General, for Respondent.

BARNARD, P. J.—The defendant was charged with having murdered his wife. He was tried before a jury and found guilty of murder in the second degree. This appeal is from the judgment and an order denying a motion for a new trial.

It is contended that the evidence is not sufficient to support the verdict. Appellant, however, mainly relies upon the contention that the court committed prejudicial error in admitting certain extrajudicial statements made by the defendant, for the reason that the *corpus deliciti* was never proved.

The following facts appear from the evidence: The defendant lived with his wife, Josephine Bonilla, and her four children by a former marriage. On the morning of November 22, 1930, he left the home, taking with him the two small sons of the deceased. He returned about 4 o'clock in the afternoon, at which time he had the appearance of having been drinking. A little later he stated that he wanted to go away again and take the two little boys with him. His wife refused to let them go, saying it was too cold. The

defendant became angry and an argument ensued between the defendant and his wife, during which he called her vile names. During this argument he said in reference to his wife: "What in the cabron did he want her for; what did he want her for; and he used that vile word." He then stated that he was going away, that he did not need her any more, and he demanded that she unpack his suitcase so that he could take it. He then went into the next room and emptied some of his wife's things out of his suitcase and packed his own clothes therein, although he left the suitcase in the same room. A little later he started to go away in his Dodge touring car, and his wife opened the gate for him. He then told his wife to get in the machine and go with him. She remonstrated, saying her clothing was very thin and it was a very cold day. As one witness testified: "He used some bad words and said she would have to go." She went away with him at 5 o'clock, which was the last time she was seen alive. The defendant returned to his home alone between 9 and 9:30 o'clock that evening, at which time he informed the children of deceased that they could "say goodbye to mother because he had taken her to the undertaker".

The first time defendant was seen after leaving his residence about 5 o'clock was shortly before 6:30 o'clock the same evening, when he appeared at the home of one Lopez and asked if he could use a telephone, stating he wanted to get a doctor because his wife was in a faint. He was taken across the street to the home of one Hernandez, where he stated he had been in an accident and wanted to call the police. He said he believed his wife was probably dead. Hernandez asked him why he did not take her to a hospital or to a doctor, but the defendant insisted on calling for the police, which Hernandez did. Hernandez testified that while they were waiting for the police to arrive the defendant stated the following: "He said up along some Muscoy station, that he was coming and some Ford truck, I believe he said, was about to pass his car and it cut in a little too short and hit him and his wife fell out at that time, and he took after the truck trying to stop it, which he did not succeed in doing. He turned back to where his wife had fallen out, and he was about to pick her up and he asked her if she was hurt, and he said she did not answer. He

put her in the car and he thought she was dead.'' A little later, the defendant told this witness's brother, according to his testimony, that as he was proceeding along the road to Verdemont, the door of his car suddenly flew open and his wife fell out. Ten or fifteen minutes after Hernandez had phoned for the police but before they arrived, at the suggestion of Hernandez, the defendant started to take his wife to the county hospital, Hernandez agreeing to tell the police where he had gone. The defendant was next seen at the county hospital at 6:55. He told the attendant there that he had been in an automobile accident. The attendant went out to his automobile, where he found the body of Josephine Bonilla sitting slouched down in the front seat of the automobile. After a short examination, he told the defendant that she was dead. In regard to the defendant's attitude at the time, this attendant testified as follows: ''His emotional status or attitude was that of—well, some excitement but not that of remorse; he did not seem remorseful over the fact that the woman in the car was dead.'' The coroner was called, and to him the defendant stated that he almost had a wreck at the corner of Fifth and Mt. Vernon, which frightened his wife, and as they proceeded, a little this side of Muscoy, his wife fell out of the car and he stopped, put her in the car and took her to the hospital. When asked by the coroner at what time this accident occurred, he said it was around 5 o'clock. He also stated that he first took her to a friend in San Bernardino and that this friend told him to take her to the county hospital, which he did. Later that evening, a police officer named Hyatt had a conversation with the defendant, in reference to which Hyatt testified as follows: ''Well we were called on a wreck, and we asked where the wreck was, and he said on Fifth and Mt. Vernon. He said the car hit his wife there and knocked his wife out of the car, and I said, 'Did you get the license number of the car,' and he said, 'No, it was too dark,' and I said, 'Could you recognize the car, Ford, or roadster, or touring car?' and he said it was a roadster, touring car, sedan or Ford truck. I asked him if he got the license number and he said it was too dark, he could not get it. I asked him if the fellow stopped and he said 'No, he didn't hit my car,' and he says 'We were walking across the street and a car hit my wife and knocked her down.' I said to

him, 'Where is your car now?' And he said it was on Sixth and Mt. Vernon, 'We had a wreck on Sixth and Mt. Vernon,' and I said, 'Come and show us the car' and he did, and his car was parked on the west side of Mt. Vernon and north side of the street, and we got up there and he said, 'This is my car,' and we looked over the car and the car wasn't torn up. I said, 'Where did you have your wreck?' And he said, 'I had a wreck at Muscoy and Highland avenue.' He said, 'My wife fell out of the car and I took her to the hospital and she is dead.' He said, 'That is all right, that is my wife'.''

Another officer testified as follows: ''Well I asked him what had happened, and he said that Josefina Flores, his wife, was killed, and I asked him how this happened and he said she was in a wreck, that is she was crossing the street and a car hit her, and I asked him what kind of a car hit her and he said a Ford. I said, 'a Ford sedan, or a coupe, or a touring car', and he said 'a little truck', and Officer Hyatt said, 'Did you get the number?' He said 'no, it was a truck', and I said, 'What time was this when this happened?' And he said, 'About 5:30.' I said, 'Where did it happen?' He said, 'At Fifth and Mt. Vernon.' Then he said that his wife was dead, Josefina Flores; that it was all right, because it was his wife.''

Another officer testified that the defendant told him the following: ''that when they reached the intersection of Fifth street and Mt. Vernon they almost collided with another machine which was driving in the opposite direction; it frightened his wife very much and she hollered and screamed, and they drove on up Mt. Vernon avenue and up Cajon road, north of Highland avenue, and all of a sudden the wife fell out of the machine; he saw her just as soon as she was leaving the machine and he stopped as soon as he could and turned around in the road and stopped his machine opposite to where she was lying on the road; and he picked her up and put her in the machine in the front seat by the side of him and took her to the county hospital. I asked him if he went direct to the hospital; he said he did. I asked him about what time of day this was when she fell out and he said along about 5:30 or such a matter. And I asked him what road he traveled going to the hospital. He said he came down the Foothill road to Highland avenue,

east on Highland to some street—he didn't know just what street it was—and turned south to Base line and drove east on Base line to Waterman avenue, and north on Waterman avenue to a road that goes to the County Hospital. Then he got to the hospital and called the doctors and the doctors said his wife was dead.''

This last officer testified that he took the defendant in an automobile and went out to look at the place where the defendant claimed the accident had occurred; that the defendant watched the road and when they arrived at a point about a mile north of the north limits of San Bernardino, on the Cajon road, the defendant had the officer stop the car near a shoe that lay by the side of the road; and that this was picked up and the defendant said it was one of his wife's shoes. On looking around, the other shoe was located on the opposite side of the road, about fifty-five or sixty feet away. The defendant told this officer that he had not seen or talked to anyone that evening while he had his wife in the machine, prior to his arrival at the hospital; that he had not been to the southeast part of town that evening (that being the part of town in which the witnesses Lopez and Hernandez lived); and that he went directly to the hospital. At the request of the officers, the defendant took them to his car, which was parked at the corner of Sixth and Mt. Vernon Streets in San Bernardino. The car was undamaged, but on the floor of the tonneau they found an axe and a small bar, commonly called a wrecking bar or pinch-bar. On the cushion in the front seat of the automobile, on the right-hand side, there were a number of blood stains, the largest one being a patch about four inches square. On the upholstering at the rear of the front seat, against which a passenger would lean back, there was a small patch of blood about where a passenger's shoulder would strike the upholstering, and then there was a streak of blood about two inches wide from there down to the bottom of the seat, spreading out as it went down. A physician testified that when the defendant appeared at the county hospital at about 7 o'clock, the body of the deceased was cold and somewhat rigid. Another physician, who performed the autopsy on the body of the deceased, testified that there was a slight bruise just above the left knee; that there were six abrasions of the skin on the left foot and ankle, these being only

through the outer layer of the skin; that on the back of the head there was a horizontal cut in the skin that was broader at the left end than it was at the right; that this cut was just over the thickest part of the skull; that beneath this cut the skull was broken, the fracture being about four inches in length; and that underneath this fracture were certain injuries to the brain. The doctor testified as follows: "Apparently there had been a blow of quite a severe nature on the back of the head, apparently by a blunt instrument." And again: "It cut the scalp, more on the inner surface than the outer, and broke the skull, as a severe blow might break an egg shell, and tore the coverings of the brain just beneath this break, and also tore the brain tissues a little bit." The doctor testified that the cause of death was this fracture of the skull and the consequent injuries to the brain. No other marks or bruises of any consequence were found on the head or face. He further testified that these injuries could have been caused by a blow from an axe or a crowbar or pinch-bar, and that the injuries to the skull and brain would cause death within a few minutes. On cross-examination, this physician testified as follows: "Q. As a matter of fact this wound might have been caused by any hard instrument if it was thrown hard enough, or if it hit her hard enough? A. It probably might have; but apparently the instrument had a blunt edge. Q. The wound might have been caused by a rock with a blunt edge, might it not? A. Yes, sir, possibly. Q. It could have been caused by a piece of pavement with a blunt edge on it? A. Probably a straight edge."

We are unable to agree with appellant in his contention that the *corpus delicti* was not established. ■ ▪ This is established when it is proved that a human being is dead, and that the death occurred as the result of the criminal agency of another person. ■ It may be proved by circumstantial evidence. (*People* v. *Spencer,* 58 Cal. App. 197 [208 Pac. 380]; *People* v. *Hales,* 23 Cal. App. 731 [139 Pac. 667].) In determining whether the *corpus delicti* has been established, all of the circumstances may be taken in consideration. (*People* v. *Wright,* 167 Cal. 1 [138 Pac. 349]; *People* v. *Wood,* 145 Cal. 659 [79 Pac. 367]; *People* v. *Mar Gin Suie,* 11 Cal. App. 42 [103 Pac. 951].) ■ Only a *prima facie* case need be made out in this regard,

in order to permit the introduction of extrajudicial statements on the part of the defendant. As the court said in *People* v. *Clark*, 70 Cal. App. 531 [233 Pac. 980, 985]: "Nor is it necessary in establishing the *corpus delicti* that the means by or through which such death resulted be established beyond a reasonable doubt. The only requirement is that there be some evidence to justify the conclusion that criminal agency was the direct cause."

To the same effect see *People* v. *Jones,* 123 Cal. 65 [55 Pac. 698]. It is sufficient that there is some evidence tending to establish a criminal agency. (*People* v. *Alba,* 52 Cal. App. 603 [199 Pac. 894].) In the instant case, the death of the defendant's wife is admitted. A number of facts tend to show that the wound which caused her death was caused by a blow from a blunt instrument and not from a fall. The doctor testified that it could have been caused by a blow from a blunt instrument, such as an axe or a pinch-bar. Even his testimony that it could have been caused by a piece of pavement with a blunt edge, indicates that he was considering the question with the idea of such a piece of broken pavement being thrown or used as a weapon and not with an idea of a person falling upon it. In addition, the evidence shows that the pavement at the point where the defendant claimed his wife fell out of the car, was smooth, with oiled shoulders of dirt. No evidence appears of any blood upon the ground or pavement, or of anything unusual, although the officer testified that he made an examination of the place. On the other hand, the evidence shows the presence of blood in the place and in the manner it would naturally appear, if the blow was struck while the deceased was sitting in the front seat of the automobile. There is no evidence of such marks about the head and face of the deceased as would normally have appeared had she been thrown from a rapidly moving automobile, with a force sufficient to have caused the injuries shown. In our opinion, all of these facts, with the surrounding circumstances, such as the time that had elapsed and the conduct of the defendant both before the trip was commenced and after the purported fall from the automobile, were sufficient to make a *prima facie* showing of the *corpus delicti.* In addition to the other facts, the defendant had expressed himself as having no further use for his wife, he

was alone with her, he had with him such instruments as could well have produced that sort of injury, and the condition of the body and the acts of the defendant, aside from any statements made by him, certainly tend to indicate that the deceased came to her death through a criminal agency.

In *People* v. *Besold,* 154 Cal. 363 [97 Pac. 871], the court said: "The finding of the dead body of Cladie Besold, with a bullet hole through the skull, together with the testimony of experts that a bullet piercing the head of a person in the manner indicated by the condition of the remains would cause death, was certainly persuasive evidence that Mrs. Besold's death had been caused by a gunshot wound. The fact that no pistol or other firearm was discovered in the neighborhood of the corpse clearly tended to show that the wound had not been self-inflicted."

In that case, the court also said: "What has been said covers the point that the court erred in admitting evidence of incriminatory statements of the defendant, because, as is claimed, the *corpus delicti* had not been established. Before any of the rulings complained of had been made, the people had proved the finding of the dead body of Cladie Besold, in a condition and under circumstances which warranted, if they did not compel, the inference that her death had been caused by the violent act of some person other than herself. Undoubtedly the prosecution is bound to offer evidence which tends to show the commission of a crime, and the want of such evidence cannot be supplied by proof of extrajudicial confessions or admissions of the defendant. (*People* v. *Simonsen,* 107 Cal. 345 [40 Pac. 440] ; *People* v. *Ward,* 145 Cal. 736 [79 Pac. 448].) But here, without considering any statement of the defendant, the evidence referred to fully established the *corpus delicti,* that is, it tended to show that the person alleged to have been murdered had come to her death, and that her death had been caused by criminal agency."

When to the facts we have referred to are added the many conflicting statements made by the defendant as to how his wife received her injuries, and as to what he did thereafter, a case was made out which the jury was justified in finding to be inconsistent with any reasonable hypothesis, other than that the defendant was guilty. It would tax the credulity of any jury to believe that such an accident

as is claimed by the defendant to have happened, could have occurred within a little more than a mile of the city of San Bernardino at 5:30 P. M., and that the husband could appear near the opposite side of the city around 6:30 P. M., without having sought help for his injured wife at the innumerable places he must pass. And it is somewhat significant that when he did go to a telephone he insisted upon reporting to the police instead of seeking medical assistance. In our opinion, the evidence is entirely sufficient to support the verdict.

The judgment and order appealed from are affirmed.

Marks, J., and Jennings, J., concurred.