[Crim. No. 3365.  In Bank.—July 1, 1931.]

THE PEOPLE, Respondent, v. CLARENCE L. KING, Appellant.

Marc F. Morrison for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones and John L. Flynn, Deputies Attorney-General, for Respondent.

SEAWELL, J.—This appeal is from a judgment of the Superior Court of the County of Humboldt imposing the death penalty for the commission of the crime of first degree murder.

On March 24, 1930, the dead body of Minnie McCoy, a woman twenty-six years of age, was found near the side of the Redwood highway in a mountainous section of this state, by a highway workman, at a point within the county of Humboldt, two and one-half miles south of the Humboldt-Del Norte county line. Death was caused by a pistol bullet which had entered the left side of her head at a point one and one-half inches below the orbit of the left eye, crossed upward and forward and emerged from the right side of the head one inch back of and from one-quarter to one-half inch below the orbit of the right eye. Although the wound was fatal and rendered the victim immediately unconscious, the bullet in its course did not penetrate the brain cells and, according to the autopsy physician, death did not ensue until some time after the mortal wound had been inflicted. Whether the shot that killed Minnie McCoy was fired on February 18, or on February 20, 1930, is a matter of slight dispute, the defendant maintaining at the trial that it was fired on February 18, while several witnesses testified that they saw and talked with the defendant and deceased on February 20th on said highway and in the vicinity where the body of the deceased was found some five weeks after she met her death. By photographs the identity of the deceased was established as the companion of the defendant when she was last seen alive by any person other than the defendant. A Ford coupe was also identified as the conveyance in which defendant and Minnie McCoy were traveling. Other evidence of a convincing effect tends to establish the fact that the deceased was killed on February 20th. So far as the proof of guilt against the defendant is concerned, the particular day—whether the shot was fired on the eighteenth, nineteenth or twentieth day of February—is of small consequence, as the earlier day at most

would only tend, if the shooting occurred on that day, to give slight coloring to defendant's claim that he did not begin to withdraw or prepare to withdraw the funds of the deceased from the several banks wherein she had deposited them until *after* her death, rather than *before* her death. There is ample uncontrovertible evidence in the voluminous record which shows beyond a reasonable doubt that the defendant began making preparations to possess himself of the property of Minnie McCoy and rid himself of her at or before the time he surreptitiously fled the state with her, and that he had prosecuted with a marked degree of success the execution of his plan when he was arrested upon leaving the United States postoffice at Portland, Oregon, March 29, 1930, where he had gone in an effort to consummate, by forged signatures, a plan of withdrawing a pittance of $25.09, which remained on deposit in Minnie McCoy's name with the Missouri Valley Trust Company, located at St. Joseph, Missouri. This money had been deposited by the deceased in her home state bank before she had ever seen or known of the existence of defendant. He attempted to gain possession of said funds by resorting to the air mail service, but the officers of said Trust Company became suspicious that the signatures of the deceased were forgeries and notified the officers of the law of their misgivings and also advised them of their reply by air mail delivery, as requested by the defendant, giving the fictitious name under which he was operating and the day he would call for the letter at the general delivery window. The discovery of the body of the deceased in the Humboldt County woods had been made four days before the appellant appeared at the Portland postoffice, where he was placed under arrest as above related.

Appellant has given no satisfactory account of himself. He claims that he has no relatives and that his true name is Clarence L. King, but upon fleeing from this state in February, 1930, he assumed the name Clarence L. McCoy. He has also used the name Maynard. It appears that at one time he enlisted in the United States army from Idaho or Montana and served but one year of his enlistment. The reason of his brief service was kept out of the record by objection of his counsel. He admitted that he was "pinched" at Spokane, Washington, for bootlegging before he met the

deceased. At the trial he gave his age as twenty-six years, but in the narrative of his activities there is reason to believe that he may be several years older than his categorical reply would indicate. In his statement made shortly after his arrest he claimed that he had lived practically all his life in California, but from the transcript of testimony it appears that he spent much of his time in the states of Washington, Oregon, Idaho, Montana and other northwestern states. The authentic information concerning the defendant begins early in 1928, at Yuba City, county of Sutter, where he and his companion were apprehended in the act of stealing gasoline at night from a wood and coal yard. During his detention in the Yuba City jail on that charge it developed that he had burglarized a garage located at Marysville, county of Yuba, and had stolen automobile tools and accessories aggregating several hundred dollars in value. Upon being formally charged with the crime of burglary he entered a plea of guilty of burglary in the second degree. Upon serving approximately one year and four months' imprisonment at the San Quentin state prison he was paroled, the terms of his parole being that he was to work in a garage at Marysville and be restricted in the use of automobiles to the district in which he was employed.

The first person upon whom he called upon his release from prison was a woman named Eunice Pardee, with whom he had a pre-prison association and with whom he intermarried at Mrs. Eunice Cooper's residence, located several miles easterly from Corvallis, Oregon, a few days after Minnie McCoy's death. Mrs. Eunice Cooper was the grandmother of Eunice Pardee, and during the former's quite extended but temporary residence at Sacramento Eunice Pardee resided with her until she returned to her Corvallis home in 1926. During the period of residence at Sacramento defendant was a frequent visitor at the Cooper home. His intimate associate and companion, Charles R. Lee, who figures quite closely with the defendant in his escapades in the northwest, roomed at the Cooper house. The intimacy which existed between defendant and Eunice Pardee long antedated his acquaintance with the deceased. The latter, who seemed to have been a native of the state of Arkansas, where her mother and family reside, had not lived in California a great while before she met the defendant. He was then

a paroled prisoner, working at a garage or automobile repair-shop. Minnie McCoy, or Mickey McCoy, as she was also known, was, according to his frequent and too ready imputations, a sporting girl. The evidence shows that she was a very industrious, thrifty, sober young woman and had formed the habit of saving. Before coming to California she had made deposits and investments in modest amounts in her home state banking and financial institutions and continued to save while in this state, but she did not stint herself as to her personal adornments and necessities. After meeting defendant she negotiated the purchase of a 1929 model Ford coupe on the usual sales contract plan and paid down quite a sum as the first payment. Defendant voluntarily gave her driving lessons and manifested an unusual interest in her personal welfare. According to the statement of the defendant, he, Minnie McCoy and a man and woman whose names he could not recall, on a night early in June, 1929, drove from Marysville to Sacramento to attend a dance, and during the trip the man, who was driving a new Pontiac coupe, became so badly intoxicated that he could no longer drive, and defendant took the wheel and, after driving an hour, he collided with another car and the four were taken into custody by the law officers.

Defendant, so his story runs, being conscious that he had violated the terms of his parole, and fearing a return to prison as a parole violator, left Marysville with Minnie McCoy the following evening at 9 o'clock in her car, defendant driving, for the purpose of withdrawing himself from the jurisdiction of the state of California. Their journey was a long one, extending through the states of Oregon, Washington, Idaho, Montana and into Utah. They traveled as man and wife from the day of departure in June, 1929, to the day on which deceased was killed, February 20, 1930. Many cities and towns in the above-named states were visited. The defendant claims that they were in search of work, which was difficult to obtain. He claims to have earned a considerable sum during that period as an automobile mechanic. That he worked but little and earned but a small amount of money while he was traveling with Minnie McCoy as her husband is given support even by his own discreditable story, which from beginning to end is a challenge to credulity and is impeached where evidence

on the important facts is obtainable, and is discredited by contradictory and conflicting statements made by him in accounting for the death of Minnie McCoy, or else is so inherently improbable and unreasonable as not to be worthy of sober consideration. That she financed him during their nine months' stay in the northwest is not even doubtful. Some trouble was made the deceased which threatened her ownership of the Ford coupe by forfeiture on account of having removed the same from the state of California without having notified the seller. That this was inspired by the defendant and was a part of his program to gain nominal ownership of the car, which he actually succeeded in doing, by deceit and subterfuge, is in accord with his other acts of obtaining by fraud and forgery everything of value which the deceased possessed. While at Pocatello, Idaho, defendant says that he worked at a garage and Minnie McCoy had rooms in a rooming-house where she sold her body to men, while the defendant occupied an adjoining room connected by a door. He repeatedly referred to her in his testimony, with the evident purpose of bemeaning her, as a sporting girl, and volunteered upon several occasions to throw out the suggestion that she had contracted a venereal disease. He claims that she was a sporting girl at Marysville. That she did—certainly with the defendant's procurement and most likely in obedience to his demand—despoil her body for hire is told by the landlady of the house in which the defendant and the deceased lived from October 7, 1929, to February 9, 1930. During these four months the income of the deceased ran as high at $750 per month, and she did not leave the house to exceed six times while she was thus engaged. The landlady testified that she knew that she had in a Pocatello bank several hundred dollars. On February 9th, without any previous notice to the landlady, defendant and Minnie McCoy left Pocatello in said automobile, taking with them a steamer trunk, phonograph, oil paintings, a new fur coat of the value of $97, and other personal effects, all the property of said Minnie McCoy, and after visiting with defendant's close friend and companion, Charles R. Lee, at Vancouver, Washington, with whom he had fraternized on two previous occasions while a fugitive in the northwest, began the journey which led to the death of Minnie McCoy some ten days thereafter. During all the

times the defendant was with Minnie McCoy he was secretly corresponding with Eunice Pardee.

· It is indeed difficult to follow the defendant in his sinuous narrations of the events preceding the death of Minnie McCoy and the conversations which took place between him and the deceased immediately prior thereto, and the struggle which immediately preceded the firing of the shot by which she was slain. It would seem from a study of his many varying, equivocal and confusing stories that they left Vancouver, Washington, at 9 o'clock A. M. on the day before the homicide and drove a great distance, passing through Grants Pass, Klamath Falls and Crescent City, and reached the point where the body of the deceased was found between 1 and 2 o'clock A. M. He stated that much of the time on the return trip was spent in registering protests on his part against returning to California, but the deceased insisted upon going to Eureka, California, and although he was in command of the car he proceeded against his will, bound for Eureka. In his first statement he said that the deceased had been threatening to turn him in as a violator of his parole. She had heard about the Pardee woman. She said if he would take her to the coast she would sign the car over to him and not bother him any more. She also said he was not going to marry any other woman. After leaving Grants Pass she had her gun where she could get her hand on it all the time. In other statements he admitted that he did not see a gun in her possession, but he had a "suspicion" that she had a gun. No credible evidence was introduced which tended to prove that she ever owned or knew how to use a pistol. He stated that they had been arguing all along the line, "when she pulled the gun and said, 'You son of a bitch, I will kill you right here,' and I slammed down on the pedals of the car and I pulled her left arm down with my right arm and swung my left arm around and caught her right arm with my left hand as she pulled the gun to shoot and it went off two or three times. [He afterwards admitted that but one shot was fired.] I shut my eyes when the shooting took place and the first thing I saw when I opened them up she had slumped down in the seat and blood was all over her face, she was bleeding hard. . . . I said, 'Good God, Mick!' By that time the car was stopped and I went around to her side after I got

out of the car and I thought she was dead, and then when I got hold of her I knew she was dead and saw she was not breathing. . . . The car was stopped on the right side of the road headed into California. I just looked around and knew I had to do something and did not want to get caught with that mess on my hands. Then I took her by the legs and the back, her feet were on the running board, then I picked her up and half carried and half dragged her off the highway about 15 or 20 feet. I remember the place because there was a little hollow place and a log. I hated like hell to leave her like that, but I wanted someone to come along and see her and I thought it was best for her to be left there, as someone would notice her. [The body was dragged from the highway and hidden from the traveled highway by logs, where it remained until it was discovered more than a month thereafter by a highway caretaker who was engaged in cleaning out drainage ditches.] I then went back up to the car and I saw the gun on the floor of the car. I picked the gun up and tossed it upon the shelf back of the seat. I turned around and started back and before I got to the Oregon line a car passed me, but I did not pay any attention to it. After I had driven about 15 or 20 minutes from the body I came to a place where there was some water along the edge of the road and I stopped and cleaned up the mess in the car, as there was some blood in the car and on the running board, there was some blood on the sleeve of my coat, and I washed that off. I cleaned everything up the best I could in the dark, and then I drove north back to Oregon. . . . I had her purse, as it and a watch were in the car, the watch was in the side pocket, as the wrist band was broken, and I think it is there yet. [The wrist watch was probably torn from her wrist as she recently had been seen wearing it and it was given to Eunice Pardee by defendant soon after he arrived at the Cooper ranch.] The purse was lying upon the back at the time of the shooting and I think that I also have that at home. [The money in the purse, amounting to several dollars, was appropriated by the defendant and the purse was given to Eunice Pardee shortly after his arrival at the Cooper ranch.] I had in the car on my back all of our belongings, a hat box and a grip belonging to her which contained all her belongings."

The defendant then relates driving to the Cooper ranch near Corvallis without stopping except at some small town to eat and meeting Eunice Pardee, whom he told that he had just arrived from Eureka, where he had taken "this girl". He stated that he had told Eunice Pardee in his letters written at Wallace and Pocatello, Idaho, "about this woman Mickey McCoy, but had never told her what she was doing or what the circumstances were". Continuing, he said, "she was so darned glad to see me that she did not say any more about the woman. I knew there was nothing in the grips, that is that would incite her suspicion, and I told her I had a couple of grips that I told this girl [Minnie McCoy] I would take to her mother. Eunice just took it for granted that that was right." Continuing, he stated that he stayed at the Cooper ranch two or three days, went to Portland and rented an apartment under the name of Mr. and Mrs. Clarence King, and then went to Vancouver and from there expressed some used and worthless garments, old shoes and wearing apparel belonging to Minnie McCoy to her mother, Mrs. Flora Horn, whose residence was Malburn, Arkansas, without name or address of consignor, or note of explanation. They then returned to their apartment, and on March 1, 1930, they went to Vancouver and were married.

He further stated that while he and the deceased were together he made deposits of his money in the name of the deceased and made certain payments on her behalf. This contention was made to minimize the forgeries which he committed in drawing her funds from several banks, which will hereafter appear. That he completely dominated Minnie McCoy appears too plain by her submissions to him to require extended discussion. It is in evidence that she received from $700 to $800 per month for the four months she remained at Pocatello, and that she had been otherwise employed during their stay in the northwest. This alone amounted to a fund of $2,800 to $3,200. The defendant was given sums of money by her to be deposited at the bank. How much he was given is not ascertainable, but several hundred dollars found their way to the bank. He was earning but a small amount compared with what she was receiving from the occupation in which she was engaged at his behest. In his effort to show that he had earned a

sufficient sum to meet the expenses of his stay in the northwest and to account for moneys which he claimed to have advanced on account of Minnie McCoy, upon making the most liberal allowance in his favor, it fell below the necessary figure and he pieced out the deficiency by saying that he was paid $100 by his friend Lee and won money by gambling with cards. Returning to his said first statement, which he signed, he concluded it as follows:

"While living in Portland with my wife Eunice I had to get the title to the car straightened out and we drove to Boise, Idaho, and went to the License Department in the Capital Building. I filled in the name of Minnie McCoy on the back of the certificate of title and signed my name transferring the car from Minnie McCoy to myself. In other words, I forged her name.

"The gun or automatic pistol that killed Mickey McCoy is home on the Cooper ranch laying on the side of an old dresser in my wife's and my bedroom. The purse which belonged to Mickey McCoy is still in our room also. I told my wife that it was one of Mickey's old purses. Mickey's wrist watch I think is still in the car at the Cooper ranch. At the time of the shooting we had between us, Mickey McCoy and myself, about $80.00." The defendant's attempt to arm the deceased with the thirty-two Savage automatic pistol with which she was shot to death and which was afterward found in his possession is too absurd and incongruous to merit the serious consideration of court or jury. We herewith append a portion of his examination by the district attorney of the county of Humboldt, at the county jail, taken some six weeks after the homicide, as a fair sample of his attempt to divert the accusatory facts from himself:

"Q. When you first knew she had a gun on you this side of the checking station and above Klamath, where did she have this gun?

"A. She was sitting in the seat and had this pistol kind of pulled up around her as I remember the gun was here and she had it covered up with her hand. (Then the witness indicates.)

"Q. How long have you been carrying a gun?

"A. She had the gun in her possession, presumably in her wraps or purse. I can't say exactly, all the way from Van-

couver, because I know she had not been into any of the grips where the guns could possibly have been previous to that time.

"Q. Where did she get the gun?

"A. That I do not know.

"Q. Did she have the gun when you first met her?

"A. I never seen the gun.

"Q. When was the first time you ever knew—

"A. The first time I ever suspicioned was in Pocatello, Idaho, when I seen some .32 calibre bullets in her possession.

"Q. You knew she had a gun?

"A. I didn't know for sure; I surmised as much, I cannot say.

"Q. You traveled with her and slept with her for a period of several months?

"A. I can't say I exactly slept with her. I was working daytimes and she was working practically all night. We had separate rooms.

"Q. At the time you were registering—

"A. At the times we checked into hotels I stayed with her; we checked in as man and wife.

"Q. You were sleeping with her, traveling with her, and didn't know she had a gun?

"A. The gun was never brought up."

.   .   .   .   .   .   .   .   .   .   .   .

"Q. You got out and ate your supper or dinner at Grants Pass?

"A. Yes, sir.

"Q. And then you didn't know she had that gun until you passed the checking station on the California line and had reached between Crescent City or the checking station and Klamath before you realized she had the gun?

"A. Yes, sir, that she had it in her immediate possession.

"Q. Just what was it that caused you to realize that she had that gun in her immediate possession?

"A. It was just sort of a suspicious movement, the way she would hold her hands, move it around in her coat.

"Q. She had been carrying it all the way from Vancouver for a period of 12 or 14 hours?

"A. She must have had it in her wraps or coat.

"Q. The only wraps was just the coat she was found in?

"A. Yes.

"Q. She didn't have a holster to carry it?

"A. It must have been in her purse then; it is the only thing I can recall, I am not sure, I cannot say.

"Q. Did you see her take the gun out from any place when you realized she had the gun?

"A. No, sir, I did not.

"Q. Well now, just what were those suspicious movements or what do you mean when you saw the unusual movement that led you to believe she had the gun?

"A. At the time I didn't see anything. When I first noticed the movements something kind of made me feel that she had a gun, but at the same time I didn't say anything to her.

"Q. Didn't ask her what she had?

"A. No.

"Q. Didn't ask her whether she had a gun or not?

"A. No.

"Q. When was the first time that you saw the gun?

"A. When she pulled it on me I realized it was a gun right then because I seen it.

"Q. You had seen it?

"A. I seen it when she pulled it on me.

"Q. Where did she pull the gun from? She said, 'You son of a bitch I will shoot you now'?

"A. She said 'You son of a bitch I will kill you now.' Up flew her hands.

"Q. What did you do?

"A. I slammed down on the brakes, swung around in the seat.

"Q. Did you grab her?

"A. I grabbed at her more like this (indicating) kind of closing my eyes. If I ever felt like I was going to get shot I sure did then.

"Q. Did you get her gun hand?

"A. I didn't get her gun, I can't hardly say as to whether I grabbed her gun. Everything happened so quick it sounded to me as if there was a couple of shots or possibly the concussion from the shot."

The attitude of the defendant to the deceased as showing a totally abandoned heart and a want of the common human instincts which the situation should have awakened in the most cruel of mankind is well illustrated in his own statement

which we hereafter quote. The autopsy physician testified that the deceased probably lived for a considerable period after she was shot, as the bullet in its course through the head did not come in contact with any organ which would cause instant death. His opinion is based upon the fact that the autopsy showed that the lungs had gradually filled with blood, and this would not have been so had death immediately ensued. His brutal treatment of her body, whether life was extinct or not, at the time he hurried away from her crumpled remains, concealed from public view by the irregular contour of the mountain side and the log behind which he had dragged her, is best illustrated by his own words:

"Q. When you got out you looked up and heard the sigh, you said, 'Good God Mickey'?

"A. Yes.

"Q. You didn't see any blood streaming from her face?

"A. No, there was blood all over her face, I know the blood was running on the dress and coat.

"Q. Did you see any blood streaming from the face after the shot and after you got out of the car, came around and opened the other door?

"A. She was bleeding, surely.

"Q. Was it flowing out of the face?

"A. Flowing from somewheres, her head was bent over, and the blood was running down around the front of her.

"Q. Did you know where she was shot?

"A. Not exactly.

"Q. Did you ever make any effort to find out?

"A. No.

"Q. After you got around and pulled her out of the car, there was no motion any place, she was just slumped there?

"A. Yes.

"Q. Where did you think she was shot?

"A. I knew she was shot somewhere in the head on account of the blood.

"Q. What part of the head did you think she was shot?

"A. I don't know, I imagined she was shot somewheres around the front, because everything seemed all blood, just seemed to dawn on me that is where she was shot.

"Q. Did you look to see if the bullet had struck her in the head?

"A. No, I didn't.

"Q. Didn't examine to see whether the brains were flowing out or not?

"A. No.

"Q. Did you take her hat off to see?

"A. She didn't have a hat on.

"Q. Now listen, was she still bleeding when you dragged her down in back of the log?

"A. I suppose she was, because there was blood all over her; I can't say, I didn't see no blood gushing from her.

"Q. How did you seize her to bring her out of the car and drag her down back of the log?

"A. After I got her feet out first, I kind of got my arm under her legs and the other under the shoulder.

"Q. Carried her?

"A. Kind of half carried and dragged.

"Q. Feet dragging or head?

"A. If any part her feet were dragging.

"Q. After you got her out of the car did you lay her on the side of the road?

"A. The first place I laid her down was the spot I left her.

"Q. After you laid her down did you fool over her to see if there was any life?

"A. I suppose a few moments I will say.

"Q. A few seconds?

"A. Not exactly seconds, just stood there and looked.

"Q. Did you put your hands on her after you laid her down?

"A. After I laid her down I never touched her any more.

"Q. Did you look to see after you laid her down if there was any life?

"A. I had already taken for granted she was dead.

"Q. Did you feel any warmth in the body when you were carrying her?

"A. I don't recall getting my hands next to her body when I was carrying her.

"Q. Didn't you have, when you got your arms around her back, you had your hands under her arms?

"A. Kind of got one arm around her back and the other one down here.

"Q. Did you have your right arm under her back, or left?

"A. Left arm.

"Q. Did you feel any warmth then on either arm at all?

"A. Well, I can't say I felt any warmth, possible a little, yes.

"Q. Did you get any blood on you?

"A. I did, yes.

"Q. On which arm?

"A. I got it on, some, a little bit on my left arm and some on this other arm.

"Q. Some on your right and some on your left?

"A. Yes.

"Q. When did you get the blood on your right arm?

"A. I don't know when I got it on my arms or overcoat at all, until after I laid the body down and I seen I had blood on my coat.

"Q. Is that the clothes you had on?

"A. This is the suit, yes, sir, but I had an overcoat.

"Q. Any blood on your suit or just the overcoat?

"A. Sent them to a cleaners in Corvallis, Oregon.

.    .    .    .    .    .    .    .    .    .    .    .    .

"Q. Before you met Eunice?

"A. Afterwards.

"Q. Did Eunice see the blood?

"A. No, sir, I taken my overcoat off.

"Q. Did she notice any on your trousers?

"A. No, very little on my trousers, I wiped the most of it off.    .

"Q. Did you notice whether or not the blood was streaming from her face and head when you were carrying her?

"A. No, sir, I watched more where I was going, watched my step in carrying her, everything seemed all blood around her face.

"Q. Did the blood seem flowing or coagulated?

"A. When I did look, it seemed more like it was flowing.

"Q. Did it stream on the ground in back of you?

"A. I didn't notice.

"Q. Did you notice when you came back on the road?

"A. I never looked."

The defendant was utterly unable to explain the manner in which deceased shot herself almost on a line directly

through the head, the bullet entering the left side—the side which was next to the defendant—and passing out the right side of the head. The defendant made a number of explanations as to how the deceased, in attempting to shoot him shot herself in a most unnatural and improbable, if not impossible, manner. At the trial of the case he testified: "Well, after she threatened me and I turned I noticed her hands they were more in this position (illustrating) . . . and appeared as she had both hands on the gun and I don't know as she was holding the gun with both hands or which hand, but as near as I can remember, the best of my recollection, the gun would be in a position possibly a little bit higher (illustrating). The muzzle of the gun wasn't pointed directly toward me, like this would be more like—but I actually don't know which hand she had the gun in as far as that goes, it might have been her left, might have been the right, holding the gun something like this, so it looked as if in both hands, pointed not directly toward me, but more in the direction of the steering wheel . . . I don't know which one (finger) she had on the trigger or which one she was actually gripping the gun with; I just noticed it at a glance."

The defendant disclaimed at all times that he grabbed or held the arm or hand which was directing the pistol or in any way deflected the pistol in any manner. His several attempts to account for the actual shooting are simply beyond human understanding. Beyond doubt he stripped from the person of the deceased everything of value, and took her steamer trunk and suitcases, with their contents, and removed from her clothing all marks that would serve to identify her.

According to his testimony, he drove from Vancouver, Washington, to the place where he disposed of the body of the deceased and drove back to the Cooper ranch, where Eunice Pardee had arrived from her Sacramento residence but a few days before, without rest or sleep. He gave all of deceased's clothing and articles of value to Euince Pardee. Almost immediately upon his arrival and while his clothing and the cushion of the seat where Minnie Mc-Coy had sat bore the stain of her blood, he began making trips in the car of the deceased in company with Eunice Pardee about the country. He forged the dead girl's name

in at least four separate transactions, one of which he profited from to the extent of $300; another to the extent of $85, and the attempted third forgery led to his arrest. The forgery of her name purporting to transfer her Ford coupe constituted the fourth.

When he was arrested at Portland, June 29, 1930, he denied that he was with Minnie McCoy at the time she was killed. Upon being asked by Police Detective Tackaberry, of Portland, Oregon, if he knew she was dead, he replied: "Yes, Joe took her down the line and blowed her topper." The evidence connecting him with her in the journey became so overwhelming that the mysterious "Joe" theory was dropped as a defense.

On March 24, 1930, the defendant wrote from Portland to a friend, Ed. Dalton, at Wallace, Idaho, where defendant and Minnie McCoy had lived and where she had worked for some time, as follows: "Is Chris and Mott still with you? Give my regards to Earl and the boys. Will explain the reason for my flighty departure from that town when I see you. You probably know I had a dame working in a joint there. That is all over now." That Minnie McCoy was the person referred to in the above letter cannot be seriously contested.

The defendant and Minnie McCoy were seen by two or three travelers on the Redwood highway on or about February 20, 1930, who had occasion to converse with them.

William E. Martell, an automobile salesman, saw the defendant and the deceased in the highway late on the afternoon of February 20th, not a great way from where the homicide took place. Both were on the highway engaged in a quarrel, and the defendant approached Minnie McCoy in a threatening manner. Martell told him to take his hand off the woman. The woman said, "All I want is my money." It should be noted here that defendant admitted in one of his statements that one of the last subjects heatedly discussed before the killing was money matters. In reply to the deceased's request for her money, the defendant said, "You will get your money in time." The girl repeated several times that all she wanted was her money and requested Mr. Martell to settle the argument. Defendant invited Martell to have a drink and as he opened the car to draw out a pint bottle half full of liquor, he

noticed a pistol in a holster. As he touched the pistol he said he guessed, "We don't need that right now." The deceased had on a very heavy fur coat, no doubt the coat she bought in Pocatello. He thought both showed the effect of liquor. The car was also identified as Minnie McCoy's car. Several other witnesses who were upon the highway, gave evidence which either identified the defendant or tended to identify the automobile in circumstances which were unusual and need not be set forth.

■ We have not set forth all of the facts and circumstances of an accusatory character with which the record abounds, and which conclusively establish the guilt of the defendant. The motives are apparent.

■ Defendant and appellant insists that the *corpus delicti* has not been proved. We think the foregoing statement of the case fully answers appellant's contention. The *corpus delicti* must be proved like any other fact, that is, beyond a reasonable doubt. The people must first produce sufficient evidence to send the case to the jury, and the jury are first to be satisfied from the evidence that the crime has been committed. This the jury has done and its conclusions are substantially supported by the evidence.

■ The defendant complains that the trial court refused to give an instruction to the effect that the defendant was presumed to have a good reputation or character, without stating the trait involved. However faulty in substance, the instruction was properly refused for the reason that the reputation of the defendant was directly assailed by showing that he had been convicted of burglary, stealing gasoline and bootlegging. When his character was thus impeached it was his duty, to avoid the force of the impeachment, to show though convicted nevertheless his character was good. This he did not attempt to do. He stood as an impeached defendant before the jury and the court properly refused to instruct the jury as requested.

■ The court did, however, instruct the jury that the law clothed the defendant with the presumption of innocence and that the reputation of a person accused of crime is in law to be presumed to be good until the contrary appears from the evidence, and that the jury would not be justified in drawing any inference unfavorable to the defendant from the fact that he offered no testimony as to his good

character on the case. Clearly the instruction as given was much more favorable to defendant than he was entitled to have under the law. The instructions were full, fair and liberal and the defendant was denied no substantial right either as to rulings of the court upon the admissibility of evidence of the law as given to the jury.

The judgment and order are affirmed.

Richards, J., Preston, J., and Shenk, J., concurred.

Rehearing denied.