[Crim. No. 1019.   Fourth Dist.   Apr. 29, 1955.]

THE PEOPLE, Respondent, v. DONALD C. KING, Appellant.

Thomas Whelan for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

MUSSELL, J.—The defendant was charged with the crime of manslaughter (Pen. Code, § 192, subd. 1) in that on or about July 17, 1953, he did "wilfully, unlawfully and feloniously, without malice, kill one Otto Joseph Meyer, a human being." A jury returned a verdict of "Guilty of the crime of voluntary manslaughter as charged in the information." Defendant's motion for a new trial was denied and he was sentenced to imprisonment in the state's prison. He appeals from the judgment of conviction and the order denying his motion for a new trial and contends that the corpus delicti of the crime was not established independent of extra-

judicial statements of appellant, and that the evidence is legally insufficient to support the judgment; that therefore the trial court erred in denying appellant's motion for an advised verdict at the close of the People's case, and in denying appellant's motion for a new trial.

On July 18, 1953, between 4:30 and 5 p. m., the body of Otto Meyer was found on the floor of the living room of his home near Rancho Santa Fe in San Diego County. A deputy sheriff who was called to the scene, and who arrived at about 7 p. m., observed Meyer lying on his back in the living room area just inside the doorway leading from the kitchen. His legs were slightly drawn up and a white bed pad was partially over and partially under his body. There was a pillow near his head and what appeared to be some drapery material underneath the pillow. The officer testified that Meyer's physical appearance showed he was dead and rigor mortis had set in; that Meyer had a bruised black right eye; that his nose and lips were bruised; that he had a few superficial scratches on his legs and a small laceration on his right forehead; that he was dressed in a pair of shorts only; that there was dried blood underneath his nose; that there was blood alongside of the pillow, on the pillow, on the floor, and on the doors adjacent to the wall, as well as on the edge of the door jambs about five feet from the floor; that there were indications in one area that the blood had been cleaned up; that there were traces of what apparently was blood in the vicinity of a small partition or serving counter; that the house was quite untidy but that there was no evidence of any furniture having been overturned or of anything having been broken; that on top of the deepfreeze was a pair of glasses which the defendant subsequently identified as his and that there was some red substance spattered on them.

At about 10 p. m., July 18, 1953, Dr. Lloyd, a pathologist, performed an autopsy on the body of Meyer and his examination showed that the deceased was about 43 years of age, about 5 feet, 11 inches in height, and weighed about 150 pounds. The anterior portion of the chest was flat, there was a bruise on the top of the scalp, a swelling of the tissues of the right eye and an abrasion to the right side of this eye. There was a bruise of the right upper lip and also below the left ear and multiple small bruises over the left chest. There were small abrasions of the skin of the right elbow, right knee and both lower legs. The right eye was in an almost closed condition. Interior examination disclosed some

bruises in the muscle tissues under the area of the exterior skin bruises and eight ribs on the left side were fractured. There was a small amount of blood in the left chest cavity and a very extensive abdominal hemorrhage. There were about four quarts of blood in the abdomen, some of it partially liquefied and there were some clots. The liver was quite enlarged and was below the margin of the rib on the right side. There were four lacerations of the liver, both on the right side and left side. One of these lacerations was 4 or 5 inches long, another about 3 inches long, another about 2 inches long, and one about 1 inch long. There was some hemorrhage around the right and left kidneys.

The laboratory report showed an alcohol level in the blood of 3.6 milligrams per c.c. The doctor testified that this would indicate intoxication and that the level at which death would generally ensue from intoxication would be 5 milligrams per c.c., or over. He further testified that the death of Meyer was due to a massive hemorrhage in the abdominal cavity due to traumatic laceration of the liver; that in his opinion the injury could possibly be by falling but that in this particular case the most reasonable explanation of the laceration of the liver would be a blow or multiple blows; that in his opinion Meyer lived a matter of hours after he received the lacerations to his liver, roughly between five and twenty-four hours.

The record shows that the defendant was arrested at about 11:30 p. m. on the night of July 17, 1953, charged with being drunk on the highway, and thereafter was in the custody of the officers. On July 19, 1953, at about 9 p. m. defendant was questioned by officers at the Oceanside jail. He was then wearing a woolen shirt, a pair of blue jeans and a wrist watch. He was not wearing glasses and complained of his right fist, stating that he had either broken or hurt his knuckles. He stated that he had met Meyer the evening of July 14, 1953, north of La Jolla Junction; that Meyer had a flat tire and defendant stopped his car and went over and assisted him; that they then went to Meyer's ranch and he stayed with Meyer; that on Friday evening, July 17th, Meyer was in the bedroom of the house and was shooting a rifle out of the window; that defendant asked Meyer for the gun and after obtaining it, placed it in the closet; that Meyer slapped defendant and that he, defendant, "wound up" like a baseball pitcher and "really hit" Meyer; that he gave Meyer "a pretty good beating"; that the trousers he was then wearing

belonged to Meyer and that the wallet was in them when he borrowed them; that the wrist watch which he was wearing had fallen off Meyer's wrist at the time of the fight and that he had picked it up.

At the request of the officers the defendant wrote out a statement of his activities from the time he met Meyer, stating therein, among other things, that he met Meyer on Highway 101, north of La Jolla Junction and stopped to help him change a tire; that Meyer invited him to go to his ranch; that he stayed at the ranch until the night of his arrest; that on this night, after dark, Meyer "dropped to sleep in a drunken stupor"; that about two hours later Meyer got up and shot a rifle out of a window to scare coyotes; that he obtained the gun from Meyer and put it out of his reach in the closet; that Meyer slapped him hard on the face and that he, defendant, lost his temper and proceeded to "beat Meyer up"; that he revived Meyer with cold water, covered him with a bed cover and demanded that he lay on the floor; that he loaded his spare clothes and blanket, took the rifle and left in his car; that his car stalled just north of Lucadia and while he was trying to flag a ride, he was questioned by a highway patrol officer; that he was arrested by the officer and taken to the Oceanside jail at about 12 p. m.

On July 20th defendant was again questioned by the officers. He again related the substance of his previous statements and further stated that he injured his right fist quite severely when he struck Meyer; that the first time he struck Meyer he went only part way down, recovered his balance and struck the defendant a couple of times; that he struck Meyer "probably five or six times and he went down and stayed down"; that he "stomped" on Meyer's foot once when he endeavored to get up; that he then went to the kitchen, got a bucket of cold water and "flushed" it on Meyer's head; that when Meyer revived it seemed to defendant that Meyer mumbled "he had enough" and defendant answered "If you haven't got enough, I can sure as hell give you some more"; that defendant did not stay in the house more than ten minutes after the fight; that he picked up Meyer's wrist watch and put it on and also took a case of power tools which were in the kitchen; that the pair of glasses which were found on the deepfreeze had fallen off defendant's face during the fight; that he assumed they had been broken, that he could not find them.

At the trial defendant testified concerning the fight with

Meyer that he struck Meyer in the face only; that while in the bedroom of the house he struck Meyer "possibly three or four times"; that he then followed Meyer into the living room and there exchanged blows with him and that Meyer was finally knocked down; that he started to get up and defendant stepped on his foot and told him to stay where he was on the floor; that he, defendant, acted in self-defense; that he took the rifle with him when he left for self-protection; that he did not intend to steal any of Meyer's personal property and intended to return the tools and the rifle; that after he told Meyer to remain on the floor, he covered him with a bed pad and that he did not stomp on his body in any way; that when he left the place Meyer was alive and conscious.

An autopsy surgeon testified for the defense and stated that while he had not had an opportunity to examine the body of Meyer, he had read the testimony of Dr. Lloyd; that he was of the opinion that external violence could have caused the liver injury and that it could have been caused by a severe fall; that he did not think Mr. Meyer died of intoxication and that he agreed that death was due from hemorrhage resulting from laceration of the liver; that it would be unusual to repeatedly fall on the same injured left side to sustain the injury found in this case.

Appellant's principal contention is that the evidence, without his extrajudicial statements, does not show that the decedent came to his death as the result of a criminal agency. This contention is not supported by the record.

In *People* v. *Cullen*, 37 Cal.2d 614, 624 [234 P.2d 1], the rule is stated as follows:

"It is the settled rule, however, that the corpus delicti must be established independently of admissions of the defendant. Conviction cannot be had on his extrajudicial admissions or confessions without proof *aliunde* of the corpus delicti; but full proof of the body of the crime, sufficient to convince the jury of its conclusive character, is not necessary before the admissions may be received. A prima facie showing that the alleged victims met death by a criminal agency is all that is required. The defendant's extrajudicial statements are then admissible, the order of proof being discretionary, and together with the prima facie showing must satisfy the jury beyond a reasonable doubt."

The court also held that the corpus delicti (in a prosecution for murder) consists of two elements, the death of the alleged victim and the existence of some criminal agency as the

cause, either or both of which may be proved circumstantially or inferentially; that it is the function of the jury to draw the proper inferences from the proof of the circumstances and it is not the province of the reviewing court to overturn the jury's verdict when it is supported by substantial evidence, including the reasonable inferences to be drawn therefrom.

In *People* v. *Ives*, 17 Cal.2d 459 [110 P.2d 408], in a prosecution for murder, the body of the deceased, Robert Sherrard, was recovered as the result of dragging a portion of the Sacramento River. The body was found clad only in bathing trunks and no mark was found on it except a scratch on the head. Deceased's clothing was found nearby on the same side of the river. An autopsy surgeon testified that the deceased "Came to his death by asphyxiation by drowning"; that the condition of the heart and lungs showed a lack of oxygen or some obstruction in breathing; that Sherrard was partially or more probably totally unconscious when his body entered the water. This conclusion was based upon the condition of the lungs and heart and also an analysis of the stomach which showed traces of chloral hydrate, a substance used "as a hypnotic" to produce sleep. The court said (pp. 463-464):

"The *corpus delicti* may be proven by circumstantial evidence, and the reasonable inferences drawn therefrom. To warrant a conviction it must be proven to a moral certainty and beyond a reasonable doubt, but it is not necessary that it should be so proven before other evidence is introduced which corroborates it or strengthens reasonable inferences drawn therefrom. If a *prima facie* case is presented that the deceased met his death by means of an unlawful act of another, the evidence is sufficient. (*People* v. *King*, 213 Cal. 89 [1 P.2d 15]; *People* v. *Selby*, 198 Cal. 426 [245 P. 426]; *People* v. *Vertrees*, 169 Cal. 404 [146 P. 890]; *People* v. *Wilkins*, 158 Cal. 530 [111 P. 612]; *People* v. *Bonilla*, 114 Cal.App. 219 [299 P. 784]; *People* v. *Wagner*, 21 Cal. App.2d 92 [68 P.2d 277].)"

. . . . . . . . . . . . .

"To prove a *prima facie* case of *corpus delicti*, all that was required was to show a reasonable probability that a criminal act of another had been the direct cause of the death of Sherrard. However, in this case, each defendant appeared as a witness in his own behalf and admitted certain participation

in the offense. With both these elements present here, evidence of the *corpus delicti* was amply sufficient to submit to the jury. (*People* v. *Hill,* 2 Cal.App.2d 141 [37 P.2d 849]; *People* v. *Kelly,* 70 Cal.App. 519 [234 P. 110]; *People* v. *Kinsley,* 118 Cal.App. 593 [5 P.2d 938].)'' See also *People* v. *Black,* 103 Cal.App.2d 69 [229 P.2d 61].

█ █ In the instant case the opinion of pathologist Dr. Lloyd that the death of Mr. Meyer was due to a massive hemorrhage in the abdominal cavity due to traumatic laceration of the liver and that the most reasonable explanation of the laceration of the liver would be a blow or multiple blows is amply supported by the evidence. The severe injuries found on the body of the deceased such as the several extensive lacerations of the liver, black eye, the eight broken ribs, the bruise on the right upper lip, the bruise below the left ear, the multiple bruises on the left chest, the abrasions of the skin on the right elbow, right knee and both lower legs, coupled with the absence of any evidence that any furniture was overturned or that anything was broken in the Meyer home, together with the evidence that the blood had been cleaned up in the vicinity of the body and that the defendant's blood-spattered glasses were found at the scene, were sufficient to prove a prima facie case of corpus delicti and to show a reasonable probability that a criminal act of another was a direct cause of the death of Mr. Meyer. The circumstances in evidence establish a prima facie showing of the corpus delicti sufficient to allow the case, with the defendant's admissions, to go to the jury. The defendant admitted that he ''wound up'' like a baseball pitcher and ''really hit'' Meyer; that he gave Meyer ''a pretty good beating''; that he lost his temper and proceeded ''to beat Meyer up''; that he struck Meyer ''probably five or six times'' and when he went down and stayed down, it seemed to him that he told Meyer ''if you haven't got enough, I can sure as hell give you some more.'' These admissions, together with the other circumstances shown by the record, amply support the verdict of the jury and the judgment as well as the order of the court in denying appellant's motions for an advised verdict and a new trial.

The judgment and order denying a new trial are affirmed.

Barnard, P. J., and Griffin, J., concurred.