[Crim. No. 4315. In Bank.—February 21, 1941.]

THE PEOPLE, Respondent, v. ALBERT IVES et al., Defendants; GORDON HAWKINS et al., Appellants.

Robert H. Schwab for Appellant Hawkins.

Paul Angelillo and Arthur E. White for Appellant Simeone.

Ralph Thomas Lui for Appellant Spinelli.

Earl Warren, Attorney-General, and J. Q. Brown, Deputy Attorney-General, for Respondent.

WARD, J., *pro tem.*—Appeals by Gordon Hawkins, Mike Simeone and Eithel Leta Juanita Spinelli from judgments of conviction of the murder of Robert Sherrard, had upon an indictment wherein they were charged jointly with one Albert Ives, and from orders denying their separate motions for new trial. The defendants Ives, Hawkins and Spinelli, in addition to their pleas of not guilty, entered pleas of not guilty by reason of insanity. These pleas were withdrawn by defendants Hawkins and Spinelli. Ives was declared to be insane at the time of the commission of the offense and was committed to an asylum. Briefs and a short oral argument on the appeal have been presented on behalf of Simeone; a brief was filed on behalf of Mrs. Spinelli, and the appeal by Hawkins has been submitted upon the record. The convictions were of murder in the first degree without recommendation. In view of the Hawkins appeal, all appeals will be considered as automatic (Pen. Code, sec. 1239, subd. (b)) and the entire record searched on behalf of each defendant for error resulting in a possible miscarriage of justice. (*People* v. *Perry,* 14 Cal. (2d) 387 [94 Pac. (2d) 559, 124 A. L. R. 1123]; *People* v. *Williams,* 14 Cal. (2d) 532 [95 Pac. (2d) 456].) Consideration will also be given to matters set forth in the briefs, and to those that may suggest themselves from reading the clerk's and reporter's transcripts.

A motion for a separate trial was presented on behalf of Mrs. Spinelli and Simeone. The motion was made and argued by the attorney for Simeone and predicated upon the theory that the evidence against these two defendants would be "different and distinct", both in kind and degree, from the evidence against the other defendants; that Mrs. Spinelli and Simeone were not present when the crime was committed; that a denial of the motion would mean "that the interests of these two defendants will be materially prejudiced, and since the crime is the crime of the first degree, a great deal of con-

sideration and a great deal of thought should be given before any interests of these two clients is put into jeopardy''. The district attorney stated his theory that the defendants were aiders and abettors, and this theory was later substantiated by the evidence. The court was correct in denying the motion.

Before narrating any of the ghastly and sordid evidence describing the crime, we deem it advisable to give consideration to the sufficiency of the proof of the *corpus delicti*. The body of the deceased, Robert Sherrard, was recovered as the result of dragging a portion of the Sacramento River in the vicinity of Freeport Bridge. Clad only in bathing trunks, it was found approximately 447 feet south of the bridge, and about 150 feet out from the Yolo County shore of the river. About 404 feet north of the bridge and about 6 feet away from the highway also on the Yolo County side, the clothing of the deceased was found. Between this spot and the place where the body was recovered, the bank of the river is thickly covered with trees and underbrush. No mark was found on the body except a scratch on the head.

The autopsy surgeon testified that the deceased came ''to his death by asphyxiation, by drowning''; that both lungs were ''badly'' congested and just oozed with dark venous colored blood; that the right side of his heart was dilated, and both sides were venous in character, showing a lack of oxygen or some obstruction in breathing; that Sherrard was either partially or more probably totally unconscious when his body entered the water. This conclusion was based upon the condition of the lungs and heart, also a chemical analysis of the stomach, which showed traces of chloral hydrate, a substance used ''as a hypnotic'' to produce sleep. The chemist testified that he did not know how much chloral hydrate was actually in the stomach.

The *corpus delicti* may be proven by circumstantial evidence, and the reasonable inferences drawn therefrom. To warrant a conviction it must be proven to a moral certainty and beyond a reasonable doubt, but it is not necessary that it should be so proven before other evidence is introduced which corroborates it or strengthens reasonable inferences drawn therefrom. If a *prima facie* case is presented that the deceased met his death by means of an unlawful act of another, the evidence is sufficient. (*People* v. *King*, 213 Cal. 89 [1 Pac. (2d) 15]; *People* v. *Selby*, 198 Cal. 426 [245 Pac. 426]; *People* v. *Vertrees*, 169 Cal. 404 [146 Pac. 890]; *People*

v. *Wilkins,* 158 Cal. 530 [111 Pac. 612]; *People* v. *Bonilla,* 114 Cal. App. 219 [299 Pac. 784]; *People* v. *Wagner,* 21 Cal. App. (2d) 92 [68 Pac. (2d) 277].)

We proceed then to examine the evidence in order to determine its sufficiency in this respect. Did Sherrard enter the water while conscious, and was his unconscious condition produced thereafter? This question is sufficiently answered by the autopsy surgeon. What caused this unconscious condition if not the chloral hydrate? Is it reasonable to conclude that had the deceased desired to commit suicide, he could, in even a partially dazed condition as the result of having voluntarily swallowed the chloral hydrate, have climbed down an embankment, removed his clothing, donned bathing trunks and walked through the thick brush to the river without receiving even a scratch on the lower part of his body? It is a well known fact that while occasionally persons take this drug to induce sleep, it is generally administered by a physician. Is it reasonable to infer that a physician would have administered it at any time other than when Sherrard was so situated that he could immediately sleep? When chloral hydrate is given, other than by a physician, an inference may be reasonably drawn that the purpose is to take advantage of the person to whom it is administered. In such instances it is commonly referred to as "knockout drops". Assuming that Sherrard could have swallowed chloral hydrate voluntarily and then entered the water, it is more reasonable to conclude that the drug was administered by another for an unlawful purpose.

To prove a *prima facie* case of *corpus delicti,* all that was required was to show a reasonable probability that a criminal act of another had been the direct cause of the death of Sherrard. However, in this case, each defendant appeared as a witness in his own behalf and admitted certain participation in the offense. With both these elements present here, evidence of the *corpus delicti* was amply sufficient to submit to the jury. (*People* v. *Hill,* 2 Cal. App. (2d) 141 [37 Pac. (2d) 849]; *People* v. *Kelly,* 70 Cal. App. 519 [234 Pac. 110]; *People* v. *Kinsley,* 118 Cal. App. 593 [5 Pac. (2d) 938].)

The *corpus delicti* having been proven sufficiently, irrespective of the testimony of defendants, certain statements made by each were admissible in evidence over objection by them. A search of the record does not disclose any ground upon which an objection could have been properly sustained.

If any possible error appeared in the reception in evidence of the statements, such error was rendered harmless by each defendant voluntarily appearing on the witness stand and testifying relative to the same matters. (*People* v. *McLachlan*, 13 Cal. (2d) 45 [87 Pac. (2d) 825].)

Hereinafter certain testimony of each appellant and of Ives will be referred to or quoted, but for the present, pieced together, the tale appears as follows: Mrs. Spinelli formerly lived in an eastern city with her "common law husband" Mike Simeone, who had given her a gun. She left Simeone and came to San Francisco the latter part of January of 1940. Shortly thereafter she was "on relief". In March of the same year Simeone arrived in San Francisco and lived at the address of Mrs. Spinelli, where Ives, Sherrard and Hawkins were in the habit of visiting. Mrs. Spinelli, nicknamed by her associates "the Duchess", took part with Ives in the making of "blackjacks", although she testified she did so only as a result of a threat of Ives to injure her daughter by placing her in a resort in the Chinese quarter of the city. In the course of the association of the four defendants with Sherrard, a robbery in which the proprietor of a barbecue stand was shot and killed, was perpetrated in San Francisco; the gun used at the time was later proven to be the one given Mrs. Spinelli by Simeone. The defendants, learning that Sherrard was "talking too much" about the affair, left San Francisco and went to Sacramento, where, at a picnic along the Sacramento River, and while Sherrard was in swimming, the four defendants discussed various ways and means of killing him. It was Mrs. Spinelli's idea to make his death as painless as possible, and it was Simeone's to camouflage the killing as a suicide. During the same evening, at their hotel, Sherrard was given whisky drugged with chloral hydrate furnished by Mrs. Spinelli, Simeone offering the drink to Sherrard, and later Simeone and Hawkins assisted in carrying the partly unconscious youth to a waiting automobile. Hawkins and Ives then transported him to the river and threw him over the Freeport Bridge into the water. These facts are substantiated in part by each defendant.

At the conclusion of the case for the People, the attorney for Simeone strenuously contended that the evidence was insufficient to connect Simeone with the commission of the offense, and moved for a "directed" verdict in favor of his client. It was stipulated that the motion should apply to all

of the defendants. In denying the motion, the court called attention to the circumstance that during the afternoon preceding the evening when knockout drops were administered to Sherrard, Simeone had taken part in a conversation on the subject of doing away with Sherrard; that there was evidence Simeone knew in the evening that the knockout drops were going to be put into Sherrard's whisky, and that he poured the whisky into a glass or paper cup from which Sherrard subsequently drank. Such evidence, or the substance of it, as above set forth, appears in written admissions of Simeone. There was sufficient legal evidence upon which to deny the motion for a directed verdict.

While the testimony of an accomplice cannot be considered on the question of defendant's guilt or innocence unless the latter is connected with the commission of the offense by other independent evidence which, as appellant Simeone contends, must, to be sufficient, go further than merely to show the commission of the offense, or the circumstances of its perpetration—in this case the statements and admissions of appellant Simeone are sufficient to meet the requirements of this rule. (*People* v. *West,* 4 Cal. (2d) 367 [49 Pac. (2d) 276].) In addition to his statements that during the afternoon of the picnic the subject of administering knockout drops to Sherrard had been discussed; that he had offered the drink containing the drug to the youth, and had later carried the unconscious Sherrard on his shoulder from the hotel room, it was independently proved that there was chloral hydrate in the stomach of Sherrard, and that Simeone fled from the scene of the crime with the other perpetrators thereof. These facts taken collectively or separately are not consistent with a theory of the innocence of Simeone. (*People* v. *Robbins,* 171 Cal. 466 [154 Pac. 317]; *People* v. *Kempley,* 205 Cal. 441 [271 Pac. 478].)

Up to this point, the sufficiency of the corroborative evidence has been considered as of the time of the submission of the case for the People. If, for the sake of argument, it be assumed, as appellant Simeone contends, that the testimony given by independent witnesses is insufficient as corroboration, and that error was committed in the admission of his written statements, there is the further fact that later, in his voluntary appearance as a witness, Simeone made admissions of his participation in the crime. The same condition prevails as to each of the other appellants voluntarily appear-

ing as a witness in his or her own behalf at the trial, who made admissions connecting the witness with the execution of the murder plot. (Pen. Code, sec. 1111; *People* v. *Negra,* 208 Cal. 64 [280 Pac. 354]; *People* v. *Tinnin,* 136 Cal. App. 301 [28 Pac. (2d) 951]; *People* v. *Hanks,* 35 Cal. App. (2d) 290 [95 Pac. (2d) 478]; *People* v. *King,* 30 Cal. App. (2d) 185 [85 Pac. (2d) 928].)

Upon submission of the case to the jury, the evidence showed that Simeone had advised that the death should have the appearance of a suicide. The independently proved circumstances of the finding of the body attired only in swimming trunks, and the discovery of Sherrard's clothing under circumstances apparently designed to indicate that Sherrard had placed them there while he went swimming, indicated that Simeone's instructions had been carried out.

On the trial each defendant testified on his or her own behalf to facts and circumstances tending to place the blame on some other defendant. On appeal, Mrs. Spinelli seeks to name Ives as the instigator of the plot to kill Sherrard, while Simeone attempts to have it appear that Mrs. Spinelli alone was responsible for the administration of the knockout drops (which she sometimes refers to in her testimony as "Mickey Finns"). Hawkins contends that he was merely following the directions and orders of others.

█ Did the facts justify the verdict returned? Let us consider the testimony of each defendant separately.

Mrs. Spinelli testified on direct examination that at the picnic, while Sherrard was down at the river swimming, she advised Hawkins that Sherrard had admitted to her that he had told his brother's fiancee all about the holdup in San Francisco and the killing of the proprietor of the barbecue stand, to which Hawkins replied that if Sherrard would tell one person, he would tell others, upon which Mrs. Spinelli remarked that since Sherrard was equally guilty he could not tell without involving himself. She said Hawkins then talked to Simeone and Ives about the matter and Ives said: "Well, that settles it. Bobby is going to die, and he is going to die right now." Later, in talking to Simeone, so she testified, Ives said "we can wait until we get to Gary, Indiana for this here"; that during the afternoon the four defendants discussed ways and means of getting rid of Sherrard; that among the methods suggested, it was proposed to tie him to a railroad track, beat him to death, run over him with a car,

drown him, shoot him; that later on that evening when they returned to their hotel in Sacramento, Ives said to her: ''You people going on through here and help me with this? . . . If you tell Mike and Gordon to help me, they will help me.'' She stated Ives then told her he could get outside help on the job if necessary, but ''you know the price you are paying''; that she and Simeone then talked the matter over, the others being requested to remain outside the room during this conversation; that she told Simeone she had three grains of ''Mickey Finn'' crystals and she would go down and get some whisky and put them in. She further testified: ''And when I went out of the room I taken these crystals with me and I emptied them out of a little small capsules, three grain capsules, that they were in into the bottle that had been on display here . . . and put enough whisky in it to dissolve the crystals and then I went back in the room and put the whisky on the dresser and laid this little bottle [a perfume bottle] on the dresser also.'' She stated that when Sherrard, Hawkins and Ives left the room for a moment she ''opened the bottle and I poured these Mickey Finn—this solution into the cup that was on the dresser. . . . And then Al and Bobby and Gordon came back in the room, and Mike poured the whisky out, and he handed Bobby a cup . . . of whisky.'' She testified that neither Gordon nor Ives took the drinks poured for them, Hawkins saying ''I don't drink when I am driving an automobile . . . if I know I am going to drive a car, I never drink''; that Ives said he never drank whisky— ''only beer''; that Simeone and Sherrard continued to drink, and that the men ''then played with wrestling around there, and they were sparring and boxing''; that shortly thereafter Sherrard became ill and was ''kind of staggering''; that she requested the men to get him downstairs; that someone said ''How are you going to get him out of here?'' and Simeone replied: ''I will pick him up''; that he set Sherrard up on his shoulder and carried him to the head of the steps; that she then picked up her purse and went downstairs with two of her children for something to eat.

It is not necessary to refer to the cross-examination of Mrs. Spinelli except to note the following: The gun used in the barbecue stand holdup and killing was found on Mrs. Spinelli at the time of her arrest on the present charge; it had been in her possession since approximately one hour after the killing of the proprietor of the stand. In her purse, also, were

blackjacks. Referring to placing the crystals or the solution thereof in a cup, Mrs. Spinelli testified: "Q. Well, at the time that Mike poured the whisky on top of the crystal solution, do you know whether or not he knew that the solution had been put into the cup? A. Well, to my best knowledge, yes. Q. Did you tell him you had? A. He was right there. . . . Q. That is, you did tell him you were going to put the knockout drops in there? A. He and I had talked about that ahead, when I talked to him alone in the room. Q. You talked with one another, you told him you were going to put them in? A. Yes. Q. And it was he who poured the whisky on top of them, and it was he who gave the drink to Bob? A. As far as I know, yes, sir."

Simeone testified that Ives had made several threats to get rid of Sherrard and suggestions as to how it could be done; denied that Mrs. Spinelli had ever mentioned knockout drops to him, but admitted that he had poured the whisky into three cups handed him by Mrs. Spinelli. He stated that Ives and Hawkins refused to drink and that he drank the portions poured for them; that he offered Sherrard the third drink; that Sherrard subsequently drank the whisky contained in a paper cup, and later he and Sherrard drank from the bottle. He denied that he handed Sherrard the cup containing the knockout drops. He testified that in removing Sherrard from the hotel room, he only went as far as the steps and then back into the house; that he did not know anything about the drowning until the next morning when one of the party spoke of it while they were in the car. On cross-examination Simeone testified that during the afternoon, as they were sitting on the bank of the river Mrs. Spinelli took from her purse a small bottle and showed it to Ives, Hawkins and himself. He stated: "Somebody asked what was in it and somebody said knockout drops." At this period Sherrard was down by the river. Simeone further testified: "Al was talking about shooting a guy in Frisco, which he shot a man in Frisco, and he was scared of Bob and wanted to take him out and get rid of him"; that Ives said "We ain't going to let Bob live because he is talking too much. I ain't going to fry for nobody," to which Simeone replied "If he does talk he will only hang himself." On being confronted with written statements made by him to the district attorney and his deputy, and, prior thereto, to a police officer, that it was agreed at the hotel room just prior to the serving of the

whisky that knockout drops should be placed in Sherrard's drink in furtherance of their plan of the afternoon to kill him because he talked too much; that he knew when he poured the drinks that Mrs. Spinelli intended to place the knockout drops in Sherrard's whisky and referring to his participation in transporting the drugged youth from the hotel room to the waiting automobile, that ''We took him downstairs'', he denied having made such statements.

On the day of the picnic Hawkins drove several members of the party to the bank of the river and then returned to the hotel where he went up to Mrs. Spinelli's room. He testified ''Well, she seemed to be fairly excited, she said . . . that Irene [Sherrard's brother's fiancee] was in town and . . . looking for Bob Sherrard . . . that we would have to do away with Bob, because . . . if Irene got hold of Bob, she would take him back to San Francisco, and he would talk, and we would all get in trouble.'' Hawkins further testified that upon their joining the others at the river bank, Mrs. Spinelli talked to Ives, Simeone and himself about the necessity of getting rid of Sherrard; that later he (Hawkins) drove Mrs. Spinelli, her daughter and two sons back to Sacramento to buy provisions for the picnic; that Mrs. Spinelli left the car and went to her hotel room where her daughter and Hawkins joined her. In this connection, Hawkins testified: that Mrs. Spinelli was grinding some crystals with a bottle or a spoon and upon his asking her what they were, she said they were ''Mickey Finn crystals''; that she was going to grind them and dissolve them in whisky; that after the picnic, drinks would be passed around, and she would put the knockout drops in Bob's drink and he would go in swimming and drown. Referring to the evening, on their return to the hotel, Hawkins testified that Simeone filled with whisky three of the cups furnished him by Mrs. Spinelli and offered him and Ives drinks, which they both refused; that Mrs. Spinelli offered Sherrard one of the cups and he drank its contents; that shortly thereafter Sherrard became groggy, stumbling around, holding onto things for support and falling time after time; that different members of the party picked him up on different occasions; that once Mrs. Spinelli hit him in the back of the neck; that a little later on she told them it was time for them to go out and get some sleep; that Sherrard was placed on Simeone's shoulder, and with his (Hawkins') and Ives' assistance he was taken down to the automobile and

placed in the back seat; that as the car pulled out, Mrs. Spinelli said to Ives: "Take care of Bob. You know what to do."

Hawkins further testified that as the car rolled on toward the river, Sherrard kept "rambling in his speech and talking foolishly and he said something about a girl that he used to go with and he said something at the time I didn't understand what he meant, but afterwards I figured out that he must have known that he was going to be killed or going to . . . be taken for a ride"; that he was very pale and rigid in the back seat, coughing and gasping; that during the drive Sherrard "passed out"; that his pulse was "a good twice normal"; that as they neared the bridge, Ives changed to the rear seat, saying "I want to make it look like suicide"; that Ives removed Sherrard's clothing and placed on him bathing trunks; that they then stopped the car while Ives "laid the clothes in a pile" and then drove on until they reached the bridge, crossed it and went on for a quarter of a mile further, returned to the bridge, where they stopped at the approach, and Ives told him to get out and see whether there was any water "under that railing over there"; that when he told Ives there was none, they drove on to the bridge, when they observed another car parked on the other side of the bridge; that they drove on across until they reached the highway on the other side, turned and recrossed the bridge, went beyond it, turned and again came upon the bridge, Ives indicating where he wished Hawkins to stop; that Ives then "pulled Bob out of the car" and Hawkins "heard a splash". Hawkins further testified that when Ives told him to stop the car, he (Hawkins) did not have any idea what was about to take place.

On cross-examination Hawkins was asked "Your testimony is that you had no understanding or agreement, among yourselves, to destroy Bob, is that right? A. It was mentioned many times, but it was nothing any further than that—just mentioned . . . it was planned that we were to go in and hold up a place, and it would be fixed ahead of time so that when we walked into the place Bob would be shot and killed." Hawkins was confronted with his written statement previously made to the district attorney. He admitted parts of the statement and as to other parts said that he could not remember. Finally the court asked him the following question:

"At the time that you testified that the defendant Ives boosted or threw the deceased over the railing of the bridge, did you know what he was doing then? The Witness: I did. . . . The Court: Well, what was the condition of the man at that time when his clothes were taken off and the swimming suit put on him; did he appear to know that this swimming suit was being put on him? The Witness: He was unconscious. The Court: Well, you knew he wasn't going to get into the river, didn't you—himself? The Witness: That is right. The Court: Well, how did you figure then that he was going to get into the river? The Witness: When he said that he wanted to make it look like suicide, I drew my own conclusions." In response to this question by the district attorney "Why did you feel his pulse?", Hawkins answered: "Because he was gasping and coughing. Q. Well, what was running in your mind, did you think he was going to die? A. Well, I didn't know until I took his pulse. Q. What did you say to Ives? A. I said, 'This man is just about dead.' That there was my opinion of it. . . . Q. Did you ask him why he was removing his clothes? A. I did not. Q. Why didn't you. A. Because I knew then just about what was going to happen. Q. Oh, that is when you decided that a murder was going to be committed, was it? A. Yes, sir."

After the murder, Hawkins and Ives joined Simeone and Mrs. Spinelli at the hotel, from which all the parties were later ejected. They slept in the car in a lumber yard that night, and early the next morning fled from Sacramento in the direction of Reno.

The testimony of each defendant speaks for itself. There was an express agreement to kill Sherrard. Mrs. Spinelli's suggestion that knockout drops be administered to make the killing "merciful" was followed, and the drug was furnished by her. (The idea of mercy is hardly consistent with testimony that after Sherrard had consumed the drugged whisky, and during the wrestling affair, Mrs. Spinelli struck him across the back of the neck.) Simeone and Hawkins assisted in carrying Sherrard to the death car, which Hawkins drove. If the latter's testimony is to be believed, he did not know that Sherrard was to be drowned at the time he left the hotel. However, the evidence shows him to be operating the car on a bridge and over roads with an unconscious man "just about dead", whose clothing had been removed and replaced by bathing trunks. He knew that plans had been discussed

to kill Sherrard, and that the killing was to have the appearance of suicide. Relative to placing the bathing suit on Sherrard, he testified: "I knew then just about what was going to happen." He crossed the bridge several times and made every effort to see that there were no witnesses. He saw Ives pull Sherrard's limp body from the car. He stood by—turned his head a bit and heard the "splash". To the question "You knew what had happened?" Hawkins answered "Yes."

Eliminating statements made by Ives to the police and to the district attorney, likewise his testimony given at the trial, and confining consideration to the evidence heretofore related, that evidence is amply sufficient to justify the findings of the jury as reflected in its verdict. However, in view of the claim made on appeal by Simeone that Ives' testimony was erroneously admitted and prejudicial to defendants' rights—which could with equal force be made by Mrs. Spinelli and Hawkins—we include a *résumé* of such testimony.

Defendant Ives testified that he met Mrs. Spinelli during the month of March, 1940; that he often visited at her home and associated there with her and the other defendants; that at the river bank picnic, Mrs. Spinelli showed him a bottle, saying " . . . we are going to pull some jobs with drunkards; give them some dope". Referring to the evening of the same day, Ives testified that Simeone offered him a drink in a paper cup, which he refused; that thereupon Simeone took a sip and then poured the contents of the cup into Sherrard's drink; that "Bob started stumbling" and "Mike started knocking the hell out of him" and "Bob fell down by the Duchess and then she hit him over the neck like that (indicating) two times; that Simeone carried the unconscious or partially conscious Sherrard on his shoulder to the foot of the stairs, Hawkins assisting him; that he himself opened the door of the car and, with Hawkins' assistance, put Sherrard in the back seat; that Hawkins drove the car and that Ives sat by his side; that during the ride Bob spoke about some girl and said "I think you guys are going to give me the works". Ives further testified "Mike told me to put on a bathing suit and make it look like suicide . . . We just drove off and took his clothes off and I threw him in there. . . . Q. Did you ever have any intent to kill Robert Sherrard, Al? A. Not then; just when I got my orders to get rid of him, that is all. . . . Q. Now, who was it that told you to throw him in the river?

A. Mike. Q. Mike Simeone? A. That is right. Q. Did Mrs. Spinelli say anything about it? A. They both said it. Q. What is that? A. They both commanded—both of them said it. Q. Both of them told it to you— A. That is right. Q. . . . to throw him in the river? A. That is right.'' Ives testified that on the drive Hawkins told him that he (Hawkins) had felt Sherrard's pulse, and that Hawkins said ''This guy is going out fast''; that Hawkins assisted in removing Sherrard's clothing and placing on him the bathing trunks; that Sherrard was then taken to the bridge where, after driving around to be sure no one was about, Ives was going to throw Sherrard over where they first stopped the car, but Hawkins suggested that Sherrard might hit his head against a cement or concrete abutment, so Ives took him a distance away and ''dumped'' him over the rail into the river.

On appeal, Simeone is represented by a different attorney than the one who defended him at the trial. In addition to the claim of error in denying the motion for a directed or advised verdict of acquittal, the new attorney sums up the evidence against Simeone as follows: ''1. That Simeone had apparently been convicted of a felony; 2. That he associated with Ives and Hawkins socially for a period of not more than two weeks prior to the murder; 3. That he had known Mrs. Spinelli for more than a year and lived with her as man and wife during part of that time; 4. That he was not present when the murder was committed; 5. That after the murder of Sherrard, the appellant Simeone accompanied the perpetrators and Mrs. Spinelli to Nevada and perhaps aided in their escape or attempted escape; 6. That previous to the occurrences of the night of the murder of Robert Sherrard, Simeone had reason to believe generally that Albert Ives, Gordon Hawkins, and Mrs. Spinelli were committing unlawful acts of some character; 7. That he undoubtedly learned that they had been involved in a murder in San Francisco, the details of which he did not know.''

From the foregoing it is argued that there is merely a suspicion Simeone may have had something to do with the crime, but that the evidence is devoid of proof tending to connect him with advising or encouraging it or placing him at the scene of its commission. We believe this contention has been heretofore sufficiently answered.

Prejudicial error is claimed on behalf of appellant Simeone, in that the court did not fully instruct the jury relating to

conspiracy, accomplice and "other matters". Further attention has not been called to "other matters" and reference is made to specific instructions only by number. The instructions have been scrutinized with the view of safeguarding the interest of each defendant. No error appears therein. On the contrary, considering the instructions collectively, they were framed in a manner particularly favorable to the defendants and to each of them.

Appellant Simeone contends that the court should have granted a new trial on its own motion, on the ground of newly discovered evidence. The newly discovered evidence is the fact that after the return of the verdict of guilty of murder, Ives was found to be insane at the time of its perpetration. On the motion for a new trial the court went into this question exhaustively. Unlike Mrs. Spinelli and Hawkins, Simeone did not enter a plea of not guilty by reason of insanity. As stated, such pleas by Mrs. Spinelli and Hawkins were withdrawn. The court was cognizant of the testimony offered in support of Ives' insanity plea. Two of the expert witnesses based their opinions as to his sanity at the time of the commission of the offense upon the theory that he was under the complete domination of someone else; that he was boastful of the fact that he was "the trigger man", a killer, and proud of his selection by his associates to actually do the killing. We are not called upon to approve or disapprove the conclusions reached by the jury upon the question submitted to it as to the sanity of Ives. The jury found Ives to be insane on the date of the commission of the offense. However, the expert witnesses, by affidavit or oral testimony, on the motions for new trial, in substance admitted that Ives was at all times since the 14th day of April, 1940 (the date of the commission of the murder), capable of giving a correct account of the things he had seen or heard, including the details of the Sherrard homicide. Assuming the insanity verdict to be in accordance with the contention that Ives did not know or appreciate the difference between right and wrong on the date of the commission of the offense, still no evidence appears that he was of unsound mind at the time he appeared in his own behalf as a witness on the trial. The circumstances of a killing may show a general malignant disregard for the lives of others, evidencing a heart insensible to social obligation, and an insufficient mentality to distinguish between right and wrong, yet the possessor of such heart and mind may be

competent to testify. Unsoundness of mind does not *per se* establish the incompetency of a witness. It was for the trial court to determine whether Ives was able to perceive and could make known his perceptions to others. (Code Civ. Proc., secs. 1879, 1880.) One may be insane upon a certain subject but sane as to other matters. One may be unable to distinguish legally between right and wrong, and still be able to narrate facts chronologically, correctly, intelligently and truly. (*People* v. *Tyree*, 21 Cal. App. 701 [132 Pac. 784]; *In re Mazuran*, 88 Cal. App. 272 [263 Pac. 339].) On the motions for new trial the trial judge in this case had an opportunity of considering whether Ives understood and appreciated testimony given under oath; whether he had the mental power to recollect, and the ability to narrate; in other words, the trial judge had the opportunity to and did pass upon the truthfulness of the testimony given by Ives on the trial. The trial judge was very careful to satisfy himself that an injustice had not occurred in the matter of the verdicts against Mrs. Spinelli, Hawkins and Simeone as the result of the Ives testimony. Each defendant was given every opportunity to present evidence in his or her defense. If a new trial had been granted to Mrs. Spinelli or Hawkins, the order would undoubtedly have applied equally to Simeone. There would have been no reasonable ground for granting the motions upon the ground of newly discovered evidence in favor of two of the defendants and denying it as to the third. The affidavits filed and the arguments of the attorneys in support of the motions were considered as applying to all defendants. There was abundant evidence of the guilt of each defendant independent of the testimony of Ives, who was subsequently found by the jury to have been insane at the time of the commission of the offense, so that it cannot be said that appellants or any of them were prejudiced by his testimony.

 The final point raised by the present attorney in the Simeone appeal is that the trial attorney was incompetent to properly represent the defendant; that he "showed gross ignorance or incompetence in his conduct of the trial". The point is a novel one. It often happens that an attorney will vigorously criticize opposing counsel, but seldom one on his own side. However, this is a death penalty case, and we are disposed to consider any objection advanced. The original attorney was not selected by the defendant, but was appointed by the court (Pen. Code, sec. 987), as indeed was the case

with respect to all the defendants. They and each of them are entitled to competent legal representation. (Const. Cal., art. I, sec. 13.) We realize that the accusation against the trial attorney is a grave one; and, if true, it is also indirectly an attack upon the trial judge responsible for his selection, but these considerations are of no importance as compared to the rights of a defendant to a fair trial. It is claimed that at the time of his appointment, "the ink was hardly dry" on the trial attorney's certificate of admission to the Bar; that he had been practicing but one year. The reason advanced is hardly pertinent in gauging the competency of an attorney to conduct a murder trial. He might have had twenty years of experience in the trial of civil cases and yet be grossly incompetent to defend one upon a charge of murder. One may be specially adapted to try criminal cases, irrespective of the length of time he has been practicing; or the selection may have been ill advised. The attorney may have demonstrated stupidity and ignorance; he may have blundered and floundered to the prejudice of his client. (*State of Missouri* v. *Jones,* 12 Mo. App. 93.) The best criterion of the competency, care and alertness of the attorney referred to is the record in the case.

The trial counsel is criticized for one question propounded to his client, as to whether Simeone and Mrs. Spinelli had lived together in an eastern city. That fact had already been established by several written statements introduced in evidence, and by the direct testimony of Mrs. Spinelli.

Attention is also called to a question asked under a mistaken assumption of the evidence upon cross-examination of defendant Ives, and to the failure to confront Ives with the previous testimony of a police officer. The mistaken assumption was rectified and the confronting of Ives with the transcript of the testimony of another witness was hardly the recognized method of impeaching a witness on the stand or refreshing his recollection.

The next criticism directed by counsel against the conduct of the trial by the former counsel is that affidavits were not filed on the motions for new trial to cover the fact that Ives had been declared insane. The verdict on the Ives insanity plea was returned by the same jury before the same judge in the same court and is part of the record on this appeal. We fail to understand how the filing of such affidavits—that

Ives was insane—could have assisted the trial judge in his consideration of the motions.

During the first day of the trial it was stipulated by all the attorneys that objections made by any of them to the admission of testimony should be deemed to have been made on behalf of all the defendants. It is noteworthy that the trial judge carefully differentiated in his rulings on the admission of evidence applicable to one or more of the defendants and inapplicable to others. At times the burden of defense was cast upon one defendant's attorney, and at other times upon another. The efforts of each defendant to save himself at the expense of another defendant caused a conflict of interest, with one defense attorney battling another. At all times Simeone's trial attorney seemed alert to protect the interest of his client. Certainly the record does not disclose "an exhibition of ignorance, stupidity". On the contrary, a keen knowledge of the facts and the law applicable thereto was displayed, demonstrating that the trial judge had properly protected the rights and interests of Simeone in the selection of his legal representative. If any point was overlooked by Simeone's attorney, it is not apparent in the record. It is a noteworthy fact that the trial judge not only correctly ruled upon the evidence sought to be introduced, but zealously guarded the rights of the defendants throughout the preliminaries, the trial and the subsequent proceedings.

We are convinced that the verdict of the jury against each and all of the defendants was fully justified, and that the denial by the trial court of the respective motions for new trial necessarily followed. Each defendant was fairly tried, and, notwithstanding the nature of the penalty fixed by the law of this state, justly convicted.

The judgments of conviction and the orders appealed from are, and each of them is, affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., Peters, J., *pro tem.*, and Carter, J., concurred.