[Crim. No. 2715. First Dist., Div. Two. July 17, 1951.]

THE PEOPLE, Respondent, v. HENRY ERNEST JOHNSON, Appellant.

Popper & Burnstein for Appellant.

Edmund G. Brown, Attorney General, and Clarence A. Linn, Deputy Attorney General, for Respondent.

GOODELL, J.—Appellant, charged with the murder of his wife, pleaded not guilty and was convicted by a jury of murder of the second degree. The appeal is from the judgment and the order denying a new trial.

Appellant and his wife lived in a three-room apartment numbered 2-C on the second floor of an apartment building on Taft Avenue in Richmond, California. Mrs. Johnson died in the bedroom thereof somewhere between 10 and 11 o'clock on the evening of March 14, 1950, from a gunshot wound produced by a .22 caliber rifle. The officers arrived after she had expired, and appellant was taken into custody then and there.

The verdict rests on circumstantial evidence and on extrajudicial statements of the appellant.

An adult son of the Johnsons visited them on that evening, from about 8:50 to about 9:40. The subject of the conversation between the three persons does not appear; nobody else was present. Shortly after the son departed, appellant left the apartment, visited neighbors living around the corner, and returned to the apartment shortly after 10 o'clock.

The witness Clifford E. Burns, who lived on the first floor of the same building, testified that on arriving home at about 10:08 or 10:10 he saw appellant at the foot of the stairway, apparently on his way upstairs.

The witness, Ruth N. Austin, a housewife living on the first floor directly beneath the Johnsons' apartment, testified that after retiring she heard a scream and then heard someone say '' 'No Ernest, no, don't, don't,' something to that effect. Then, I heard another scream and a thud.'' The thud she placed at ''probably 10:20 or 10:25.'' She ''sat up trying to think where it could come from, thinking it might be a little girl in the back'' and then heard walking back and forth directly overhead in the Johnson apartment which, she judged, lasted about 15 minutes, or until about 10:40. Then she heard someone walk to the door, and the door opened and shut, ''and somebody come downstairs and I heard a knock at the door'' of the next apartment [the Graceys'] and then she heard appellant's voice. Later she heard people going upstairs from the Graceys' apartment. At the time of the screams, the outcry, and the thud she heard no man's voice.

The witness Nancy Lawson, a housewife, lived on the second floor, next door to the Johnsons. She had retired at 9:30. She testified that she was awakened (but could not fix the time), and ''the first I heard was Mrs. Johnson's voice pleading 'Ernest don't, Ernest, don't' . . . And then I heard her scream— . . . I ran to the front of the house to see if anyone had heard anything, and then I went and knocked on Mr. Johnson's door.'' She apparently got no response, and started to go back to bed when someone knocked. She asked who was there. ''And they said Johnson, and I told him to get away from my door. And he went down stairs.'' Later appellant said to her ''Come on over, Nancy . . . Go on in and see Lou.'' She did so and found her on the floor. When the witness asked her what had happened she did not at first answer but later '' . . . She told me she was shot, she was dying.'' ''I asked Mr. Johnson what he hit her with, and he said he didn't hit her.''

The witness, Everett L. Gracey, whose apartment was on

the first floor of the building, testified to having heard a "deep thud" at approximately 10:20, coming from upstairs toward the rear of the apartment, and that when they (he, his wife, and their guests) heard it, they stopped and exclaimed about it "because it was louder than usual."

The witness Reuben Brehm and his wife were visiting the Graceys. He testified that "we noticed a thud . . . It appeared to come from overhead." It was "approximately 10:20 or 10:25."

Mrs. Brehm testified that they heard loud noises—a heavy noise on the floor which appeared to come from upstairs.

None of these witnesses heard the report of any shot.

Inspector Grimes identified the .22 caliber rifle which he found on the top bunk of a double-bunk sleeping arrangement in the room where decedent's body lay on the floor. He also identified the cartridge casing and the spent bullet which Officer Lee found. He testified that he examined Mrs. Johnson's clothing for powder burns but found none. His examination was by the naked eye, not by microscope.

Officer Lee testified to finding the spent .22 slug on the floor "Laying to the back of the body." He also found a .22 shell which had not been fired, lying on the bed.

The rifle had belonged to appellant for some years.

The foregoing sums up the circumstantial evidence produced by the prosecution. We interrupt the narration of facts to point out that up to this point there has been no narration of any testimony respecting appellant's admissions. While Mrs. Lawson was testifying, defense counsel called attention to the fact that the corpus delicti had not been proved. The court halted proceedings until the autopsy surgeon could attend, and he testified as to the cause of death and gave his findings. Thus the usual order of proof was observed and no testimony was offered respecting extrajudicial admissions until after prima facie proof of the corpus delicti had been made.

Somewhere around 10:30 p.m. appellant left his apartment and went downstairs. The witness Gracey testified that appellant came to his apartment and was rather nervous and fidgety. He sat down on the edge of the couch and said "My wife is upstairs dying. Call an ambulance, and help me." Brehm exclaimed "What—you shot her?" and he said "Yes." Gracey and Brehm then went upstairs to investigate and

found Mrs. Johnson lying on the floor between the bed and the wall. The witness did not remember appellant saying "I shot her, she forced me to do it. I had to do it" but testified that he did hear him say "I shot her." He fixed the time of the conversation at approximately 10:35. Appellant was in the Gracey apartment from five to ten minutes, according to this witness, before they went upstairs. When they did so Mrs. Johnson was still alive; it was then approximately 10:45. He estimated the time of death at about 11 o'clock.

Mrs. Gracey placed appellant's appearance at their apartment at about 10:15 or 10:20, but was not sure. She testified that he said "I shot my wife. She is dying; call the ambulance . . . but not the police." When Gracey and Brehm went upstairs appellant tarried momentarily and after they left he said to Mrs. Gracey "Don't get nervous, I didn't do it."

Mrs. Brehm fixed the time when appellant came to the Gracey apartment at approximately 10:30. She testified that he said " 'My wife is dying, I shot her.' And then he said, 'She forced me to shoot her.' And as he was leaving, he said, 'I didn't shoot her.' "

. The witness Brehm testified that appellant "came in and sat on the edge of the chesterfield, and said, 'My wife is upstairs dying, I had to shoot her.' . . . I then asked him what he meant by shoot, and he said 'She forced me to do it; I had to shoot and fast.' " Then after a few seconds he said 'You had better get an ambulance, or do something for her.' " He estimated that it was about five minutes before he and Gracey went upstairs, about 10:35 or 10:40. Mrs. Johnson was still alive when they reached the Johnson apartment at about 10:35. He remained four or five minutes and then called the police.

Appellant's first contention, that the verdict is contrary to the law and the evidence, is presented under four headings, i.e., (a) that there is no evidence sufficient to sustain the verdict that defendant killed his wife; (b) that there is no evidence sufficient to sustain the judgment that deceased met her death by a criminal agency; (c) that the court erred in admitting the extrajudicial statements, since no corpus delicti has been proved, and, (d) that prima facie proof of corpus delicti sufficient to admit extrajudicial admissions are not sufficient to sustain the judgment.

Appellant's position under his headings (a) and (b) is that the evidence does not show that the deceased met her death by a criminal agency. The principal basis for this

claim is that the doctor who performed the autopsy admitted on cross-examination that *from the position of the entry of the projectile,* the wound could have been self-inflicted. From that premise the argument is advanced that it was incumbent on the prosecution to prove beyond a reasonable doubt that the wound could not possibly have been self-inflicted, and that such proof was not made.

An autopsy was performed on the day after the death. The doctor who performed it testified that the cause of death was an inner abdominal hemorrhage caused by a gunshot wound. He described the course of the bullet, the wounds it made on entering and leaving the body, and the damage it did to the abdominal organs. On cross-examination he was asked "From the position of the entry of the projectile, it could have been self-inflicted?" and answered "Yes," but he also testified that no powder burns were visible on the body. Inspector Grimes testified that no powder burns were visible on the garments with which the decedent was partially clothed, and admitted that he had not used a microscope in his examination for burns.

On cross-examination the doctor testified:

"Q. As a matter of fact, from the description that you just gave to the jury as to the course of the bullet, apparently the gun was held pretty close to the deceased; is that correct? A. It had to be more than two feet as far as I could tell.

"Q. How do you arrive at that? A. Well, of course, there is one item that I couldn't definitely state, because I don't know whether the body was clothed when the shot was fired or not. . . .

"Q. Now, doctor, assuming that the bullet penetrated the coat first, would that change your testimony as to the distance of the gun, the distance the gun was held? A. I can tell you, if the bullet entered the body through the part that was not clothed, it would have to have been fired at a distance greater than two feet. Effect on the clothing would have been important if it entered the clothed portion.

"Q. Did you ever examine the coat? A. No. . . .

"Q. Assuming, doctor, that there were powder burns on the clothing, this wound could have been self inflicted could it not? A. Well, if there was powder burns, it would depend on a lot of factors; the distance in which the powder burns extended away from the wound and also the weapon used.

If the wound was self inflicted, there would have been found powder burns on the clothing.''

This testimony was given in the course of the proof of the corpus delicti. The jury might have decided that the wound was self-inflicted, but it is to be implied from the verdict that they drew the inference, because of the absence of powder burns on the body or garments, that the gun was held so far away that it could not have been fired by the decedent (following the doctor's reasoning). Such inference, if drawn, eliminated suicide of course.

However, there were additional circumstances, proved before any admissions were offered, from which it was inferable not only that decedent came to her death by a criminal agency, but which at the same time, connected appellant with the offense. We refer, of course, to Mrs. Austin's testimony as to a scream, and then the outcry ''No Ernest, no, don't, don't,'' followed by another scream and then a thud, and to Mrs. Lawson's testimony, which identified the voice as that of Mrs. Johnson, ''pleading 'Ernest don't, Ernest, don't' '' followed by a scream. There is no contradiction that Mrs. Johnson called her husband by name in a pleading tone of voice. Appellant himself corroborated it, but offered the explanation that his wife cried out in protest because he had attempted to lift her from the floor while she was in pain. The outcry, identified as Mrs. Johnson's, was strong circumstantial evidence of an assault or threat of violence of sufficient gravity to evoke the screams and the pleading cry followed by another scream, from which an inference of suicide could not reasonably be drawn.

The testimony as to the screams and outcry was part of the prima facie proof of the corpus delicti and sufficient, if believed, to have entirely eliminated suicide from the case. The fact that the doctor answered ''yes'' to the question whether *''From the position of the entry of the projectile,* it [the fatal wound] could have been self-inflicted?'' (italics added) did not contradict or limit his positive statement to the effect that in case of a self-inflicted wound powder burns would have been found. Nor could his quoted statement foreclose further inquiry as to whether the death was by a criminal agency. It simply introduced into the case an issue which was *contra* to the prosecution's theory. The testimony respecting the screams and outcry was sufficient, when taken in connection with other evidence, to make out prima facie proof of the corpus delicti. Appellant testified that the outcry, which named him, was a protest by his wife when he attempted

to lift her from the floor (which would necessarily mean that she had already fallen) while, on the other hand, the testimony of Mrs. Austin was that the outcry naming "Ernest" was *followed* by the thud. The uncontradicted testimony respecting the outcry and screams was evidence of "physical circumstances surrounding the affair" (8 Cal.Jur. 166) and, as we view it, highly incriminating evidence, which would have a strong tendency to remove any impression which might have been created by the doctor's testimony that from the position of the entry of the projectile the fatal wound could have been self-inflicted. At the very least it showed "a reasonable probability" that the criminal act of another was the cause of death (*People* v. *Ives,* 17 Cal.2d 459, 464 [110 P.2d 408]). All this evidence went in before any admissions were offered.

Appellant's third heading (c) is that "the court erred in admitting the extrajudicial statements of defendant over his objection, since no corpus delicti has been proved" and his fourth (d) is that "prima facie proof of corpus delicti sufficient to admit extrajudicial admissions of defendant [is] not sufficient to sustain judgment of conviction."

Appellant contends that "By reducing the State's evidence to its logical and simplest denominator, it is immediately apparent that the conviction of the defendant could only have come from the effect that the alleged extrajudicial statements of the defendant had upon the jury. While slight proof of the corpus delicti has in many cases been held to be sufficient basis for the admission of extrajudicial statements or confessions, every element of the crime, however, must first be made to appear before such alleged admissions or confessions are admissible, and they cannot be used to establish any necessary element for the commission of the crime. That is, the State must prove, independent of the defendant's alleged admissions or confessions, that there has been a killing and that it resulted from unlawful means."

In support of that statement (which is not too clear or explicit) appellant cites *People* v. *Tapia* (1901), 131 Cal. 647 [63 P. 1001], and because he relies on that case we must interpret the foregoing statement as contending that *in determining whether there is sufficient evidence of the corpus delicti the jury cannot consider admissions or confessions or other evidence which does not tend to prove the corpus delicti, but merely tends to connect the appellant with the crime charged.* The language which we have just emphasized is substantially

what the court said in the Tapia case, at page 654, in holding that it was prejudicial error to refuse such an instruction.

Such holding, however, was expressly disapproved 25 years later in *People* v. *Selby* (1926), 198 Cal. 426, 432-439 [245 P. 426], where there is a lengthy discussion of the subject.

In *People* v. *McMonigle* (1947), 29 Cal.2d 730, 738 [177 P.2d 745], there is a clear and complete summation of the whole subject, wherein the court says: "In this state of the record, defendant first contends that the court erred in instructing the jury concerning the evidentiary effect of his extrajudicial statements. The challenged instruction reads as follows: 'The Court instructs you that initially and in the first instance the corpus delicti for every criminal case must be proven by satisfactory evidence aside from any statement, confession or admission of the defendant. (Citing cases.) After the latter however have been received in evidence they may strengthen and fortify the proof of the corpus delicti to the extent that the evidence may have that effect.' This is a correct statement of the law in recognition of the 'sharp distinction between the rule governing the *admission* of extrajudicial statements, admissions or confessions and the rule governing the jury in its *consideration* of such evidence after it is admitted.' (*People* v. *Selby,* 198 Cal. 426, 434 [245 P. 426].) 'To warrant a conviction' the corpus delicti 'must be proven to a moral certainty and beyond a reasonable doubt, but it is not necessary that it should be so proven before other evidence is introduced which corroborates it or strengthens reasonable inferences drawn therefrom.' (*People* v. *Ives,* 17 Cal.2d 459, 463 [110 P.2d 408].)"

The opinion in the McMonigle case then (pp. 738-40) continues on with a comprehensive review of the subject, and cites many cases. At page 740 it again quotes approvingly the Selby case (198 Cal. at 439) as follows: "When the case is submitted for their verdict the jury may consider *all* the evidence in the case, including the extrajudicial statements, admissions or confessions of the accused, in determining whether or not all the elements of the offense charged and the connection therewith of the accused have been established to a moral certainty and beyond a reasonable doubt. If this were not the correct rule, proof of the extrajudicial statements, admissions, or confessions of the accused would have no utility except to connect him with the crime charged."

The rules just discussed make it clear that a defendant's admissions "may strengthen and fortify the proof of the corpus delicti to the extent that the evidence may have

that effect'' (*People* v. *McMonigle, supra*) which simply means, in the last analysis, that in ultimately determining the guilt of appellant, the jury was warranted in considering (along with all the other evidence) appellant's several admissions that he had shot his wife, as testified to by four disinterested witnesses. Such admissions, of course, indicated a death by a criminal agency.

Appellant's second contention is ''that counsel prosecuting the case has been guilty of prejudicial misconduct . . .'' and three instances are specified.

First, after the defense rested there was a colloquy respecting the admissibility of certain parts of the coroner's report, the defense contending that it was admissible because it was an official vital statistics record. Thereupon the district attorney took a card from his file and waved it before the jury, saying ''I have official records here of the police department. It is not admissible.'' Defense counsel then assigned the action as misconduct. It would appear that the district attorney's action was in response to, and evoked by, the defense's argument respecting the admissibility of official records as such. What the defense sought to show was the entry in the report that the time of the death was ''10:40 p.m. on March 14—.'' The district attorney then stipulated that the coroner's record so showed.

Several cases are cited by appellant under this head. In *People* v. *Cowley,* 7 Cal.App. 501 [94 P. 866] misconduct was practically the only ground urged on appeal. The court held, however, that it was not prejudicial and affirmed the conviction. In *People* v. *Fleming,* 166 Cal. 357 [136 P. 291, Ann.Cas. 1915B 881] the record was 4,400 pages long and contained numerous instances of misconduct. The court said (p. 359) that although there was ''sufficient evidence to legally sustain the verdict, the guilt of appellant by no means satisfactorily appears therefrom'' and the judgment of conviction was reversed. Because of the numerous instances and the flagrant character of the misconduct there, that case cannot be used as a fair basis of comparison with this case. In *People* v. *Berryman,* 6 Cal.2d 331 [57 P.2d 136], as in the Cowley case, the conviction was affirmed; misconduct was found, but held to be nonprejudicial. *People* v. *Ford,* 89 Cal.App.2d 467 [200 P.2d 867], was reversed both for ''flagrant'' misconduct and for palpable error in an instruction. It is clear from the opinion in *People* v. *Bowers,* 79 Cal. 415 [21 P. 752], that the misconduct (of both the judge and the

district attorney) would not have led to a reversal had not the case been "one of great difficulty."

The record shows nothing respecting the contents of the card, hence the case is different from those cases where the district attorney by an improper question, later withdrawn or struck out, "telegraphs" to the jury some prejudicial matter, or, where he makes a bald statement of fact which is not in the record and could not be admitted in evidence. Respondent admits that the district attorney overstepped the bounds in this instance but claims that the transgression was minor and nonprejudicial, and we are satisfied that such is the case.

 Appellant's second assignment under this head is that the district attorney was guilty of prejudicial misconduct in making certain statements in his closing argument.

The first 12 jurors examined were accepted and sworn. Eleven of them were interrogated on *voir dire* by appellant's counsel on the subject of self-defense. The first juror was asked: "I believe His Honor will instruct you . . . on self-defense. Now, if a man has killed a woman in self-defense, and the evidence justifies that, you would have no qualm about bringing back a verdict of not guilty because he acted in self-defense? . . . Understand, that a self-defense would be justifiable? . . . And the fact that it happens to be a woman who met her death when a man was acting in self-defense would not affect your verdict in any way?" The other 10 were asked substantially the same question with slight variations and some additions. The question put to one juror contained the following language: "If the facts show that the defendant acted in self-defense, *which it evidently will show*, that he acted in apprehension of threat to his life." (Italics added.) Several others were told that the jury would be, or would probably be, instructed on self-defense.

The district attorney in his closing argument said: "Now, right in the beginning of this argument they said that they wanted to go back to the questions on voir dire, and they mentioned the elements of the crime, but they forgot to talk about the rest of the thing that they talked about on voir dire. They forgot all about self-defense." Appellant objected: ". . . Voir dire examinations are for qualification purposes, and it is not evidence, and it can't be argued by the district attorney, and I ask that Your Honor instruct the district attorney to refrain from doing that, and admonish the jury to disregard the last highly prejudicial statement." Whereupon the judge said: "You will have to confine your argument to the matter of the testimony that was introduced

in the matter, and the jury is admonished that statements of counsel are not evidence in the case and they're not to be considered as such.'' The district attorney then said: ''Self-defense . . . is where you protect yourself from someone——''
The defense repeated its objection and the judge remarked ''Mr. Quinlan, there is no evidence in the case of self-defense, and you will have to confine your argument to the evidence that is in the case.

''Mr. Quinlan: That is right, Your Honor, but they mentioned in their argument about accident and self-defense. They have talked about that all the time. I say there is no evidence of it and I will agree——

''Mr. Bernstein: (Interposing) I want the record to show that we did not say one word nor argue, if the Court please. We questioned the jury for the purpose of qualification. I respectfully request Your Honor to admonish the district attorney again, and I certainly cite that as misconduct of the district attorney by reference to this matter. The inquiry is for qualification purposes and not evidence.''

''The Court: I think you understand now, Mr. Quinlan——''

The first answer to the claim that there was prejudicial misconduct, is the action of the court in admonishing the district attorney and in instructing the jury that statements of counsel are not evidence.

The second answer is found in *People* v. *Pantages*, 212 Cal. 237 [297 P. 890]. In that case defense counsel in their opening statement told the jury that they expected to prove certain things. In the district attorney's opening argument he called attention to the fact that no such promised proof had been made and did so in vehement language. The court said, pp. 244-5: ''As ruled by the trial judge, and as indicated in *State* v. *Boyce*, 24 Wash. 514 [64 P. 719], the district attorney and his chief deputy were within their legal rights in plainly and simply directing the attention of the jury to the fact that, although counsel for defendant had stated to the jury that he expected to prove certain specified facts on behalf of defendant, nevertheless no evidence had been received by the court in substantiation thereof, but when, in substance, the district attorney and his chief deputy had thus far proceeded, the limit of legitimate *quasi* argument in that regard had been reached. To go further . . . and to charge the . . . attorneys who represented defendant with the grossest of 'bad faith' in the matter, and thereupon, impliedly at least, to predicate an impassioned and compelling argument

demanding the conviction of defendant, constituted an error which was prejudicial to the substantial rights of defendant . . . When it is considered that what was said by the district attorney was apparently with the sanction and approval of the judge of the trial court, the prejudicial effect on the substantial rights of the defendant becomes apparent.''

In the first place, here there was no sanction or approval by the trial judge, but definite disapproval. Moreover in the Pantages case the court, after adopting the opinion of the District Court of Appeal, added the following (212 Cal. 278):

''While it is our conclusion that this judgment must be reversed, we feel bound to state that the instances of misconduct of the district attorney hereinbefore set forth would not, standing alone, necessarily require such a result. The other errors, however, were in our opinion vitally prejudicial, and considered together with the misconduct complained of, warrant the conclusion that the defendant was not lawfully convicted.''

The Chief Justice in his concurring opinion emphasized this: The Pantages case is so closely in point that no further authority need be cited. The only difference between that case and this lies in the fact (which seems to be unimportant) that there the *assertion* of what the defense expected to prove was made in the opening statement while here the *suggestion* that self-defense might be proved was made on *voir dire*. The language used in the present case was mild compared to that in the Pantages case, and did not constitute prejudicial misconduct.

■ Appellant's third assignment under this head arises from the following statement of the district attorney in argument:

''Mr. Quinlan: . . . they have talked a lot about our lack of evidence. But I say to you that they don't have any evidence. They are just relying upon, and trying to convince you, that we have to prove that somebody saw somebody get shot. Now, if that were true, you would never convict a secondary murderer, and that is what this defendant is. This lady was killed when only he and she were in the room.

''Mr. Bernstein: That is assuming something not in evidence and I ask that that go out and the jury be admonished.

''Mr. Quinlan: There is evidence that they were in the room.

"The Court: The jury is admonished that statements of counsel are not evidence and must not be considered by them."

It is argued that in a murder case "the killing should not be characterized as murder in advance of the verdict so finding" and *People* v. *Garbutt*, 197 Cal. 200 [239 P. 1080] is cited. There the court said: "It is true, of course, that the killing should not have been characterized as 'murder' in advance of a verdict so finding. But we do not think, in view of the connection in which the word was used by the district attorney, and the admonitory instruction promptly given by the court, that the jury was influenced thereby."

As quoted above, the jury was admonished in this instance, and we are satisfied that the misconduct, if any, was not prejudicial.

Defendant's third and last contention is that "the court has misdirected the jury" in that the court refused to give an instruction proposed by defendant that "Upon an accusation of murder, the jury has a right to bring in a verdict of manslaughter. . . ."

The first question put to defendant on direct examination was "Did you shoot your wife?" to which he answered "No sir, I did not." He was then asked to tell exactly what happened on March 14, and gave a lengthy and detailed answer. He testified that his son left the apartment around 9:40 p.m. and that he left right after; that he returned home about 10:10 p.m., and assuming that his wife had gone to bed he sat and read the paper "not knowing that she was on the floor. I had no idea." He testified that in the bedroom "there was my gun, laying on the double bed on the right side of the bed there, crossways of the bed, and she was lying behind it, between there and the wall." And continued:

"Well, I was so shocked, I didn't know what to do. It looked like she had vomited and she was still alive. So naturally I reached down to pick her up and put her on the bed. I had to pick up the gun and move it out of the way, because it was laying straight across the bed where I wanted to lay her. When I tried to pick her up, she said 'Don't Ernest don't, it hurts me.' I had to leave her lay there.

"Well, I just didn't know what to do. I didn't know how she was hurt. I saw the gun there and I picked it up and threw the bolt back on it and that is when that shell flew out and hit on the bed. It was not supposed to be a shell in the firing chamber. I never kept a shell in the firing chamber, but I always kept the bullets in the magazine."

As was said recently in *People* v. *Carmen*, 36 Cal.2d 768, 772 [228 P.2d 281] (wherein the question of manslaughter instructions in a murder case is fully discussed), "It is a settled rule that jury instructions must be responsive to the issues. The issues in a criminal case are determined by the evidence." However, there is nothing in defendant's testimony or in that of any other witness, which warranted or called for a manslaughter instruction. (*People* v. *Mitchell*, 14 Cal.2d 237 [93 P.2d 121] ; *People* v. *Mandell*, 48 Cal.App.2d 806, 817 [120 P.2d 921].) In the first place he denied shooting his wife, and the rest of his testimony simply relates to what he did after discovering her lying on the floor. He also testified that when questioned by the police officers he "told them that I didn't know a thing about it."

The doctor was questioned by the defense at considerable length with respect to the time that would elapse between wounding and death. He said "She might have died as shortly as half an hour or it might have been as long as two hours. . . . I would guess probably around an hour. That is an estimation. . . . I can say it depends on things which I have no way of knowing, such as the circulation time of the patient at the time, the blood pressure, how much exertion the patient had had prior to death, and all that would make a difference in how rapidly a person would bleed. I would just guess a half hour to two hours would be the limit." This examination was addressed to the subject of alibi, for it is apparent from the record that the defense stressed that at the trial. In other words, appellant left the apartment soon after his son left at 9:40, visited neighbors around the corner and returned about 10:10 and the wound might have been inflicted during that half-hour absence. But the doctor's testimony was necessarily only an estimate, dependent, as he was careful to say, on at least three unknown factors, which, he said "would make a difference in how rapidly a person would bleed." He frankly called his testimony respecting bleeding time a "guess." Assuming the doctor's half-hour minimum, the jury had before it the timing of the scream and the thud at anywhere from 10 to 20 minutes after appellant's return from the neighbors and they had, also, the testimony that Mrs. Johnson was still alive at 10:45 and Gracey's estimate of the time of death as 11 p.m., all of which is consistent with the doctor's minimum of half an hour, when taken in connection with the timing of the fall or thud at somewhere between 10:20 and 10:30. The deputy coroner, whose record showed death at 10:40 p.m., was not present at the time of death and

his record must have been necessarily the result of inquiries he made of others who may or may not have observed the time accurately.

Appellant admitted that he had been drinking all that day, and that when he was questioned by the officers his tongue was thick. Several witnesses testified that around the time he returned to the apartment (about 10 p.m.) he appeared to be intoxicated.

The case was carefully tried by the judge, and the rights of the defendant were safeguarded throughout. We find no merit in any of the several contentions presented on appeal.

The judgment and order appealed from are affirmed.

Nourse, P. J., and Dooling, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 16, 1951.