[Crim. No. 3611.   Second Dist., Div. One.   Dec. 22, 1942.]

## THE PEOPLE, Respondent, v. ROBERT BRUCE WRAY, Appellant.

Morris Lavine and J. Marion Wright for Appellant.

Earl Warren, Attorney General, and Eugene M. Elson, Deputy Attorney General, for Respondent.

DORAN, J.—Appellant was charged by information with the murder of his wife, Jane Roberta Wray. After a trial by jury he was found guilty, convicted and sentenced to life imprisonment. He appeals from the judgment of conviction.

The record reveals the following facts. Appellant during the month of November, 1941, lived with his wife and infant child in an upstairs apartment of a house in Santa Monica. On Saturday, November 19, 1941, shortly after 9:00 o'clock in the evening, police officers arrived at the apartment in question in response to a radio call directing them to the address and found the body of appellant's wife lying at the top of the stairs leading to the apartment. Her right leg was hanging over the stairs with the head and right shoulder in an open door that entered into the living room. The left hand was on the floor on the left side. She was apparently dead. There was a gun on her breast, pointed down towards the left breast, with the handle up toward the right shoulder. Her right hand was lying on her shoulder about two inches from the handle of the gun. One of the officers walked into the hall, heard a noise in a room, entered and found appellant just buttoning up his trousers. The officer asked appellant what the trouble was and appellant replied: ''My wife has just blown her God damned brains out.'' The officer asked appellant if they had been fighting, and appellant replied that they had had a slight argument on account of his drinking. He was asked if his wife drank and he replied no. In response to a question by the officer, appellant stated that he had been drinking in Mike's saloon all afternoon. When asked what had happened appellant stated that he was in bed asleep and his wife was in the kitchen preparing dinner; that when he woke up he noticed his wife walking out of the bedroom into the hallway with a gun in her hand, but she kept backing into the hallway saying she was going to kill herself and that she backed into the hallway and then shot herself. Appellant said the gun was his, and that he kept it in a closet on a shelf behind some paper hat bags. When one of the officers returned to the apartment after having notified headquarters appellant asked him if Mrs. Wray was dead yet, and the officer replied that she was dead. Then appellant asked the officers if they would find his glasses for him and they looked around the bedroom and did not find them. The officers attempted to question appellant further but he refused to answer until

his glasses were found. The glasses were finally found in the bedroom. On the way to headquarters in the police car appellant asked the officers if they would stop and buy him a drink. He told the officers that there were two points that they had overlooked and that if they had seen fit to buy him a drink he might have stated what those points were. He said that there had been two clues, and that if the officers had been "halfway smart" they would have noticed them. Asked what the clues were appellant replied that if the officers could not see them he wasn't going to tell them. As appellant was being booked at headquarters he repeated the statement that if the officers had not been reading so many fiction stories out of detective magazines and murder mysteries they might have been able to notice the two clues that had been missed. He said if he saw fit he could point out the two clues to the officers and these clues would help a great deal in the investigation, but he didn't see any reason why he should point them out to the officers. The other police officer who answered the radio call on the evening in question stated that he saw a bullet hole in the bedroom going through the south hallway wall into the east stairway and wall, and that he saw blood marks on the floor, little splotches of blood from the bedroom leading into the hall, coming through the hall to the stairway door and out on the stairway to the body. In different conversations with the officers appellant gave slightly different versions of the manner in which his wife had shot herself. When appellant's attention was later called to the bullet holes in the wall he stated that they were old holes and had nothing to do with the case. He also denied that the holes were bullet holes. There appears to have been plaster on the floor directly under one of the bullet holes. Appellant had stated that his wife had shot herself while standing in the doorway. The bullet hole in the bedroom wall was in the north wall of the bed room, two feet four and three-quarters inches east of the west wall and was four feet eight inches above the floor. After some questioning on this matter by the officers, appellant finally said, "Well, maybe she did shoot herself over there by that wall." One of the officers asked appellant how the gun happened to be on Mrs. Wray's chest, and appellant replied: "I don't know; I may have picked it up and moved it, I was drunk, I don't know what I was doing." The of-

ficers found a pink or red tea towel in the kitchen. There were dark stains on it, found through a laboratory test to be human blood. The gun in question was examined for fingerprints, but all that was found were smears and a couple of small pieces of red lint on the gun. The smears indicated friction of some kind by a cloth on the surface of the gun, and the lint was similar in color to the tea towel found in the kitchen. Appellant stated that Mrs. Wray had the towel with her at the time she was shot and that he had taken it off her body and hung it in the kitchen. The police had been called on the night of the shooting by L. T. Smith, who lived with his wife in the apartment below that occupied by appellant and his family. On the night in question Smith and his wife had returned to their apartment about 8:30. Shortly after arriving home Smith heard voices in the upstairs apartment. Both he and his wife listened. The voices were loud and Smith heard appellant ask Mrs. Wray where the gun was. There was some discussion relative to the whereabouts of the gun and finally appellant's wife was heard to tell appellant to go back to bed. Smith heard .appellant tell his wife to come and put the covers over him and Mrs. Wray told appellant to go on back and cover himself up. Smith then heard walking back and forth from the bedroom and then a shot and a scream and someone running, and then a thud; then he heard the baby crying and heard appellant start to talk to the baby, who was finally quieted down. After this Smith got into his car and drove to his brother's and called the police. There was testimony given by Smith and other neighbors and persons indicating that appellant did not get along well with his wife. Some of this testimony furnished direct evidence as to quarrels and violence and some of it was a relation of statements made by appellant at various times to the witnesses as to his wife. Much of these statements was of a highly derogatory nature and indicates animus on the part of appellant toward his wife. Appellant's arguments to the contrary in this respect are wholly without merit.

Appellant assigns the following as error requiring a reversal of the judgment: The refusal of the court to instruct the jury properly on the law pertaining to circumstantial evidence; refusal to give instructions concerning the theory of accidental death of the deceased, and refusal to give a proper and essential instruction concerning manslaughter;

abuse of discretion in overruling objections to the testimony of the wife of L. T. Smith, which was read from the preliminary transcript; failure to establish the corpus delicti; that the judgment is against the evidence and against law, and that the evidence is inconsistent with a hypothesis that defendant held any malice toward the deceased.

■ Appellant does not attack the instructions given on circumstantial evidence but contends that an additional instruction requested by appellant should have been given also. The requested instruction was to the effect that the circumstantial evidence must be such as cannot be reconciled with any reasonable hypothesis of defendant's innocence. The circumstantial evidence in the case at bar so strongly pointed to guilt and was so inconsistent with any reasonable theory of innocence that no further instruction on the subject of circumstantial evidence was necessary. *People* v. *McClain,* 115 Cal.App. 505 [1 P.2d 1085], cited by appellant, does not therefore apply here.

■ The same situation is presented with respect to appellant's contention as to the refusal to give instructions on the theory of accidental death. Appellant's argument is based on the ground that it might reasonably be inferred that deceased came to her death by accidental means. Such is not the case. The evidence as a whole was not consistent with a theory of accidental death. The circumstances strongly indicated murder.

Appellant's contention as to instructions upon manslaughter are wholly without merit. The jury was properly instructed on the question.

The testimony of Caroline Smith, wife of L. T. Smith, read in evidence from the preliminary transcript was merely cumulative and corroborative of Smith's testimony. Mrs. Smith was absent from the state at the time of the trial herein. It is not necessary to discuss the point involved as the admission or exclusion of the testimony clearly could have no appreciable effect upon the verdict of the jury.

■ There is no merit to a contention that the corpus delicti was not established. In addition to the summary of evidence already given it should be stated that there was expert testimony as to the wound received by the deceased and as to the indications of the approximate distance the gun was fired from the body of deceased. It is sufficient to state that

this evidence did not point to a self inflicted wound. There was some evidence of the presence of nitrates upon the hands of the deceased, but when this evidence is viewed in connection with the other circumstances, the reasonable inference, if any, to be drawn therefrom is that deceased had put her hands out either in an effort to deflect the gun aimed at her or in some similar gesture of self protection. The other evidence did not indicate that the gun had been held close to the body of deceased. ''The *corpus delicti* may be proven by circumstantial evidence, and the reasonable inferences drawn therefrom. . . . If a *prima facie* case is presented that the deceased met his death by means of an unlawful act of another, the evidence is sufficient.'' (*People* v. *Ives*, 17 Cal.2d 459, 463 [110 P.2d 408].)

The evidence is plainly sufficient to sustain the judgment and it is unnecessary to discuss further the contentions of appellant with respect thereto.

The judgment is affirmed.

York, P. J., and White, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 18, 1943. Carter, J., and Schauer, J., voted for a hearing.